UNITED STATES ex rel. FEELEY
v. RAGEN.

No. 9429.

Circuit Court of Appeals, Seventh Circuit.

March 1, 1948.

Rehearing Denied March 16, 1948.

978

George F. Barrett, Atty. Gen., and Albert E. Hallett, Asst. Atty. Gen., both of Chicago, Ill. (William C. Wines, Raymond S. Sarnow, and James C. Murray, Asst. Attys. Gen., all of Chicago, Ill., of counsel), for appellant. ·

J. F. Dammann, Robert L. Hunter, C. S. Bentley Pike, and George E. Hale, all of Chicago, Ill. (Wilson & McIlvaine, Gregory, Gilruth & Hunter, of Chicago, Ill., of counsel), for appellee.

Before SPARKS and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

The State has appealed from a judgment of the District Court which released the relator from the custody of the Warden of the Illinois State Penitentiary, who held him under a life sentence, pursuant to a conviction in the Criminal Court of Cook County, Illinois. The District Court granted a certificate of probable cause. It is admitted that the relator has exhausted his State remedies. The bases of the discharge of the relator by the District Court were first, that he was not defended by competent counsel, and secondly, that the statute under which he was convicted and sentenced, sometimes called the Habitual Criminal Act,[1] is violative of the Federal Constitution in that it denied the relator due process of law and the equal protection of the law under the Fourteenth Amendment, and it inflicted cruel and inhuman punishment.

The relator started his career of crime young in life. He had several encounters with the Juvenile Court of Cook County, the last one culminating in a fifteen-months' sentence to the St. Charles Training School for stealing money from pay station telephone boxes. Shortly after his release from the Training School he was, on June 14, 1934, convicted of armed robbery, and was sentenced by the Criminal Court of Cook County to the penitentiary for a term of one year to life. He was then almost sixteen years of age. On March 22, 1937, he was paroled.

At the May 1939 term of the Criminal Court of Cook County, it was charged by

---

[1] Ch. 38, Sec. 602, Ill.Rev.Stat.1947.

an indictment that on May 11, 1939, the relator and McNally and Norton, while armed, robbed one Kellner, who operated a stationery store in South Chicago. The indictment also contained a count for simple robbery and contained an allegation of the relator's prior conviction. Upon his conviction under this indictment he was sentenced to life imprisonment, from which he sought relief in these proceedings.

■ As to the first contention of the relator sustained by the District Court, namely, that he was not defended by competent counsel. The respondent has raised the question as to whether the relator is entitled to counsel in a State court criminal prosecution. We shall put that question to one side, as the record clearly shows that on his trial the relator was represented by counsel of his own choice. It has been held that the recital as to counsel shown in the court's record speaks absolute verity, in the absence of fraud. Christakos v. Hunter, Warden, 10 Cir., 161 F.2d 692, 694. There is no showing of fraud here, although it is hinted that counsel forced himself into the case without the relator's consent.

■ Here is what the record shows. On June 6, 1939, George B. Holmes appeared for the relator, and the Public Defender appeared for McNally and Norton. On June 13, 1939, the clerk informed the court that Holmes had entered his appearance for the relator. Thereupon, the Public Defender asked leave to withdraw his appearance for the relator, which was granted. Holmes then asked for a two or three weeks' continuance. This colloquy took place:

"Clerk: June 28th or June 27th.

"Mr. Grossman (Assistant Public Defender): Is that all right with you?

"Defendant Feeley (Relator): I want to talk to my attorney first. I would like to speak to him you know."

The case was then set for June 27, on which date the record shows Holmes appeared for the relator. The question of waiving a jury came up.

"Holmes: My client will tell me in a minute or two whether he will waive a jury or not. I want to talk to him right now, if I may.

\* \* \* \* \* \*

"The Clerk: \* \* \* Does Feeley (relator) waive a jury?

"Defendant Feeley: No. I want a jury.

"The Court: All right, get a jury.

"Holmes: My client wants a jury. What do you say, Feeley, do you want a jury?

"Defendant Feeley: Yes."

McNally and Norton then entered pleas of guilty, but Feeley went to trial with Holmes appearing for him. The State's Attorney made his opening statement. Holmes declined to make an opening statement. From then on Holmes continued to represent the relator, and no objection was ever raised thereto during all the time preliminary to the trial and all through the trial. The assumption that Holmes forced himself into the case against the relator's wishes is not borne out by the record. Since the relator states that Holmes was never paid anything, it seems strange indeed that Holmes would enter the case and stay in without pay if some one had not solicited him to do so. Certainly, there is nothing to show Holmes' representation was objected to. So the relator entered upon and went through the trial with counsel of his own choice.

■ We now find the District Court trying the competency of Holmes as counsel. Holmes is dead. So is the judge who tried the case. Seven years after the trial, the relator says his counsel is incompetent. Who was Holmes? He graduated in law at Union College in 1890. In the same year he was admitted to practice in Illinois and practiced until 1919, when he was elected a Municipal Judge of Chicago, on which bench he continued to serve with distinction until 1932. He filled a vacancy on this court for a few months in 1934. At the time of the trial he was about seventy-one years of age. To establish his incompetency as the relator's counsel in 1939, the court admitted over the respondent's objection a circular sent out to its members in 1936 by the Chicago Bar Association in which the Association refused to endorse Judge Holmes as a candidate for Municipal Judge,

reciting his education, experience, and exceptional record as judge and concluding: "With sincere regret we find that his advancing years have placed such limitations on his capacity for judicial work that he is not now qualified for the office." We do not think that this bulletin was competent to prove anything. If it had any probative value at all, it was a warm approval of Judge Holmes' education, experience, and judicial record and said nothing detrimental about him except that his age, in the opinion of the authors of the circular, placed limitations upon his capacity for judicial work. That circular, had it been competent, would not prove or tend to prove Judge Holmes' incompetency to act as an attorney.

■■■ Then the testimony of a criminal lawyer of the Chicago Bar who had known Judge Holmes and was acquainted with his physical and mental abilities from 1936 to 1939 was introduced. He expressed the opinion that Judge Holmes was incapable of conducting an important criminal trial. However, he never saw Judge Holmes in the courtroom in the defense of the relator; he knew nothing of the manner in which the case was conducted. He had no trials with or business contacts with Judge Holmes. He based his opinion upon his casual observance of Judge Holmes as he saw him about the Criminal Court building and while they were both candidates for judge in 1936. The substantiality of such opinion evidence is as open to us to evaluate as it was to the District Court. California Fruit Growers Exchange v. Sunkist Baking Co., etc., 166 F.2d 971. The most that can be said for this opinion evidence is that it had no probative value. Dayton P. & L. Co. v. Comm., 292 U.S. 290, 299, 300, 54 S. Ct. 647, 78 L.Ed. 1267.

■ The next item of evidence as to Judge Holmes' competency was a transcript of the evidence heard in the trial in which Judge Holmes defended the relator. The District Court was hypercritical of some of the actions and omissions of Judge Holmes in the conduct of the trial. We have read the transcript carefully, and with all due respect to the District Court, we are unable to agree with it that the transcript of that trial shows incompetency of Judge

Holmes as counsel. Looking upon it in cold print nine years after the event, we cannot say that some of the actions or omissions of Judge Holmes could not be criticized. But we do say that the record does not begin to indicate that degree of incompetency of defense counsel in the conduct of a trial that amounted to no defense; that the trial was such a sham and a mockery that it amounted to a denial of due process in that the relator had in reality no counsel. Where the relator appeared before the bar with counsel of his own choice, a member of the bar in good standing and of long experience and presumed to be competent, whose incompetency to act as counsel has not been shown by any probative evidence in this record, we think that the Criminal Court of Cook County had jurisdiction and never lost it by some mistakes counsel, on a hypercritical view of the printed record nine years later, may seem to have made.

■ We are not deciding whether the Federal Constitution requires counsel in a non-capital case tried in a State jurisdiction. See Foster et al. v. Illinois, 332 U.S. 134, 67 S.Ct. 1716; Betts v. Brady, Warden, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. Assuming that the Federal Constitution requires counsel in a State case of this kind, the relator had counsel, as we have pointed out. Whenever the court in good faith appoints or accepts the appearance of a member of the bar in good standing to represent a defendant, the presumption is that such counsel is competent. Otherwise, he would not be in good standing at the bar and accepted by the court. The constitutional requirements have been met as to the necessity for counsel. If the action of counsel in the presence of the court in the conduct of the trial reduces the trial to a travesty on justice, such conduct might be considered on the proposition that such a trial was a denial of due process. The conduct of counsel in the trial of a case is that of only one of the officers of the court whose duty it is to see that the defendant receives a fair trial. He is only one of the actors in the drama. The best of counsel makes mistakes. His mistakes, although indicative of lack of skill or even incompetency, will not vitiate the trial unless on the whole the representation is of such

low caliber as to amount to no representation and to reduce the trial to a farce. A fair appraisal of the record in this case does not remotely approach such a state. Diggs v. Welch, 80 U.S.App.D.C. 5, 148 F.2d 667.

Petitions challenging the competency of counsel, especially years after the conviction, must clearly allege such a factual situation which if established by competent evidence would show the representation of counsel was such as to reduce the trial to a farce or a sham. Otherwise, they should be dismissed. Diggs v. Welch, supra.

There should not be a rigid formalism in habeas corpus proceedings in which courts are seeking the substance as to the violation of constitutional rights. But it must be remembered that habeas corpus is a collateral attack by the courts of Federal jurisdiction invading the province of State jurisdiction, and the trial of the competency of counsel is only a phase of this collateral attack. To warrant such collateral investigations of the competency of counsel, the pleadings should lay a foundation therefor by proper factual averments, and competent evidence must clearly support such averments. We should not lose sight of the fact that the Federal courts are being used to invade the sovereign jurisdiction of the States, presumed to be competent to handle their own police affairs, as the Constitution recognized when the police power was left with the States. We are not super-legislatures or glorified parole boards. We as courts look only to the violation of Federal Constitutional rights. When we condemn a State's exercise of its jurisdiction and hold that the exercise of its powers is not in accordance with due process, we are in effect trying the States. It is State action that is on trial, and a decent regard for the coordinate powers of the two governments requires that we give due process to the State. That is the reason that in habeas corpus cases the relator must first show that he has exhausted his State remedies to open the way for the Federal courts to try the State's exercise of its sovereign power. For after all, the States represent the people more intimately than the Federal Government.

To redress an alleged imbalance between the State's exercise of its power and the rights of the individual, the Federal courts exercise a delicate function, the importance of which points up our duty to consider that imbalance in the light of the rights of organized society through the State Government, representing all the people, as against the relator-defendant. There is no room here for crusades or the fulfillment of missions. We are to hold the balance true. Frank v. Mangum, 237 U.S. 309, 329, 35 S.Ct. 582, 59 L.Ed. 969; Urquhart, Sheriff, v. Brown, 205 U.S. 179, 183, 27 S.Ct. 459, 51 L.Ed. 760; Baker v. Grice, 169 U.S. 284, 290, 291, 18 S.Ct. 323, 42 L.Ed. 748.

The relator assumes that he was sentenced under the Habitual Criminal Act of Illinois and has challenged the constitutionality of this statute, asserting that it violates the due process and equal protection provisions of the Fourteenth Amendment and inflicts cruel and inhuman punishment. We do not find it necessary to pass upon the constitutionality of the Habitual Criminal Act. The sentence and judgment of the court do not indicate that they were under the Habitual Criminal Act. They could have been under the armed robbery provisions of the Criminal Code, Ch. 38, Sec. 501, Ill.Rev.Stat. 1947, the constitutionality of which is not raised in this proceeding. Since the relator is lawfully confined under the armed robbery statute, and since the conclusion of lawful confinement is the only conclusion necessary to the adjudication of this habeas corpus proceeding, the constitutionality of the Habitual Criminal Act is not before us. McNally v. Hill, Warden, 293 U.S. 131, 135–140, 55 S.Ct. 24, 79 L.Ed. 238. It is our duty to decide the case without passing upon the constitutional question raised, if we may do so. A decent regard for our systems of dual sovereignty and separation of powers requires it. Arkansas Fuel Oil Co. v. Louisiana ex rel. Muslow, 304 U.S. 197, 58 S.Ct. 832, 82 L.Ed. 1287; Arkansas Louisiana Gas Co. v. Department of Public Utilities et al., 304 U.S. 61, 64, 58 S.Ct. 770, 82 L.Ed. 1149; Baker v. Grice, supra, at page 292 of 169 U.S., 18 S.Ct. 323. True, the allegations in the indicment as to the

prior offense were stipulated in the trial. The crimes with which the relator was charged were robbery and armed robbery. The so-called Habitual Criminal Act does not define a new crime or add an additional element to any crime charged. It goes only to the punishment. Graham v. West Virginia, 224 U.S. 616, 623, 624, 32 S.Ct. 583, 56 L.Ed. 917; People v. Lawrence, 390 Ill. 499, 504, 511, 61 N.E.2d 361, 363, 364; People v. Hanke, 389 Ill. 602, 604, 60 N.E.2d 395, 396.

The judgment[2] of the court does not mention the Habitual Criminal Act. It simply recites the conviction of the relator of robbery as charged in the indictment and imposes the penalty of life imprisonment. The verdict of the jury found that the relator had committed armed robbery, thus warranting the sentence and judgment passed upon it. For the penalty in such case the court did not have to look to the Habitual Criminal Act. The penalty for armed robbery is as follows: " * * * if he is armed with a dangerous weapon, or if he has any confederate present so armed, to aid or abet him, he shall be imprisoned in the penitentiary for any term of years not less than one year or for life." Ch. 38, Sec. 501, Ill.Rev.Stat. 1947.

It will be noted that this statute authorizes a penalty of any number of years, not less than one, or of life. The court imposed the life sentence. It had two statutes under which it might pronounce sentence and judgment of life imprisonment. One was the armed robbery statute, and the other was the Habitual Criminal Act. From the court's judgment, it does not appear that the relator was sentenced under the so-called Habitual Criminal Act. Therefore, he must have been sentenced under the armed robbery statute. The penalty under the Habitual Criminal Act is measured exactly by the penalty for armed robbery, so that there was no necessity for resorting to the Habitual Criminal Act for authority to impose a life sentence. Assuming that the Habitual Criminal Act is unconstitutional, about which we express no opinion, the court could properly base its sentence and judgment of life imprisonment upon the armed robbery statute, the constitutionality of which is unquestioned in this proceeding.

Since the oral argument, the able counsel who have so diligently represented the relator on this appeal have cited authorities as to the ineligibility of the relator to parole if sentenced under the Habitual Criminal Act. We do not reach that question, since we do not find the Habitual Criminal Act to be necessarily involved.

We find no violation of the relator's rights under the Federal Constitution. The District Court improperly discharged the relator, and its judgment is

Reversed.

---

[2] "This day comes the said People, by Thomas J. Courtney, State's Attorney, and the said Defendant as well in his own proper person as by his counsel also comes, and now neither the said Defendant nor his counsel for him saying anything further why the judgment of the Court should not now be pronounced against him on the verdict and judgment of guilty, heretofore rendered to the indictment in this cause.

"Therefore, it is considered, ordered and adjudged by the Court that the said Defendant Thomas Feeley is guilty of the said crime of Robbery in manner and form as charged in the indictment, and that he has been heretofore convicted of Robbery in this cause, and the said verdict and judgment of guilty, and that he be and is hereby sentenced to confinement at hard labor in the Illinois State Penitentiary for said crime of Robbery in manner and form as charged in the indictment.

"That he has been heretofore convicted of Robbery, whereof he stands convicted and adjudged guilty for the term of Natural Life * * *."