(No. 34001.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GORDON DE SIMONE *et al.*, Plaintiffs in Error.

*Opinion filed November 26, 1956.*

EDMUND H. GRANT, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (FRED G. LEACH, EDWIN A. STRUGALA, IRWIN D. BLOCH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, WILLIAM L. CARLIN, and LESTER SHAPIRO, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

Gordon DeSimone and James DeSimone, brothers, together with Fred and Don Schaible, also brothers, were indicted in the criminal court of Cook County for the murder of John Hodaly during the course of an attempted robbery. After pleading not guilty they were jointly tried by a jury which returned verdicts finding the Schaible brothers not guilty and the DeSimone brothers guilty. The punishment of Gordon DeSimone was fixed at death while that of James DeSimone was fixed at 40 years imprisonment in the penitentiary. After motions for a new trial and in arrest of judgment had been made in behalf of the DeSimones and denied by the court, judgments were entered on the verdicts. By this writ of error the DeSimone brothers, hereafter referred to as defendants, seek a review of the record.

Although numerous errors have been assigned, a reading of the record brings into focus those relating to the

defendants' contention that they were deprived of their constitutional right of a fair trial by the "utter incompetency" of their appointed counsel. Such a contention finds its foundation in the decisions of this and the Federal courts which recognize that the conduct of counsel in a criminal trial may be such as to deny a defendant the fair trial that is contemplated by the due-process provisions of both the State and Federal constitutions. (*People* v. *Morris,* 3 Ill.2d 437; *People* v. *Stephens,* 6 Ill.2d 257; *People* v. *Clark,* 7 Ill.2d 163; *People* v. *Schulman,* 299 Ill. 125; *United States ex rel. Hall* v. *Ragen,* 60 F. Supp. 820; *Diggs* v. *Welch,* 148 F.2d 667; *United States ex rel. Feeley* v. *Ragen,* 166 F.2d 976.) The rationale of the cited cases is that a defendant's right to assistance by counsel is not satisfied by the mere formality of an appointment of an attorney by the court, but that such right embraces effective representation throughout all stages of the trial, and where the representation is of such low caliber as to amount to no representation or to reduce the trial to a farce, the guarantees of due process are violated.

The facts of the present case, insofar as they relate to defendants' claim that their representation was such as to deny them due process, reveal that the Schaible brothers and the defendants were, respectively, represented by different counsel at the joint trial which followed the denial of motions for severance. Noteworthy at this point is the fact that the attorney who defended the Schaibles below appears as counsel for the defendants on this appeal. Initially, the public defender was appointed to represent the defendants at a time shortly after their arraignment. Within a week, however, defendants filed a petition praying that a certain husband and wife, who were engaged in the practice of law, be appointed as their counsel and such appointment was made. It was the former, however, who conducted most of the defense. After representing defendants for a period of seven weeks, during which

a mistrial of the cause occurred, the appointees sought and were denied leave to withdraw as counsel. Shortly after this, the defendants, purportedly acting upon their own initiative, filed a petition for a change of venue from certain judges of the criminal court and such a petition was granted. Apparently as a consequence the appointed counsel renewed their request for leave to withdraw, but such request was again denied. On the same day, the defendants, again purporting to act for themselves, filed a petition which was denied, praying that one of a list of attorneys submitted be appointed as their counsel. From the foregoing it would appear that the appointed counsel entered into the trial of the cause some two weeks later with reluctance, and that the defendants then had little confidence in such counsel.

The reasonable limits to which a judicial opinion must be confined do not permit a complete or detailed analysis of each and every act of counsel which is now complained of. We shall, therefore, confine ourselves to what appear to be the most flagrant violations of competent representation.

During various stages of the *voir dire,* counsel indicated to the jury panel the defense would be that defendants were not guilty by reason of insanity at the time of the crime, that such insanity continued, and that the jury would be asked to commit defendants to an insane asylum. Thereafter, while examining several individual jurors, counsel represented by his questions that the sole burden of proof under such a defense would rest on defendants, whose duty it would be to prove they were insane. It was only after such representation had been made several times that the court, upon objection by the prosecution, explained to counsel and the jurors that when a defense and evidence of insanity is interposed, it also becomes incumbent upon the People to prove beyond a reasonable doubt that a defendant was sane at the time the crime defended against was committed. (See: *People* v. *Skeoch,* 408 Ill. 276;

*People* v. *Jenko,* 410 Ill. 478; 14 I.L.P., Criminal Law, sec. 303.) Although the mistaken concept of proof conveyed to the jurors was corrected by the court's explanation and by a later instruction, we agree with the observation that it is incredible that one would undertake to defend a murder charge on the ground of insanity without acquainting himself with the fundamental evidentiary requirements incident to such a defense. Also, under this point, we are impelled to remark that counsel's action of informing the panel that the defense of insanity had been unsuccessfully employed in several lurid murder trials which had attracted nationwide attention could only serve to impair the effectiveness of such a defense in the eyes of the jurors.

To prove the defendants insane, counsel summoned numerous lay witnesses, including the parents, friends, relatives and fellow-workers of the defendants. In more than one instance, however, such witnesses testified to facts which tended to show the defendants were sane and upon one occasion, the court, with great difficulty, prevented counsel from introducing certain letters in evidence which had been written by Gordon DeSimone while he was in prison and which the court construed as being possible documentary proof of his sanity. At the same time many of the witnesses were permitted to testify to irrelevant matters which conveyed to the jury the impression that the defendants were evil men who would be likely to commit the crime of murder. Upon inquiry by the court concerning the tendency of the defense evidence to convict, counsel revealed that he had not previously talked with a majority of such witnesses at any time prior to trial and that he did not know what their testimony would be. Thereafter, upon several occasions when the replies of witnesses were patently damaging to the defense, the trial was stopped and the court recessed to permit counsel to determine what his witnesses could testify to. In most instances it was also

necessary for the court to suggest to counsel what line of questioning should be undertaken. Further witnesses subpoenaed by the defense, presumably to testify on the issue of insanity, were several newspaper reporters, the State's Attorney, and a member of the Chicago Crime Commission. In a preliminary discussion of such witnesses with the court, counsel admitted he did not know what he expected to elicit from them, and an examination of the testimony of those called bears this out. The complete unfamiliarity of counsel with what his witnesses would testify to, or what he expected to prove by them, is, in our judgment, totally incompatible with any concept of effective representation.

In an apparent effort to establish medical proof of defendants' insanity, counsel called a psychologist and a psychiatrist as witnesses for the defense. An examination of the former's testimony reveals the only clear facts elicited were that results of generally accepted tests given the defendants proved them to be of average intelligence. Here again, when counsel floundered in his examination, the court suggested he confer with the witness before proceeding further. The psychiatrist who testified had not examined the defendants, and counsel sought to introduce his expert opinion through the medium of a hypothetical question. Although given unlimited opportunity and many suggestions by the court, counsel was never able to formulate a proper hypothetical question limited to the facts of the case and abandoned his effort, remarking to the court that he was "stumped" and that "he didn't know what to do next." On this occasion, and others, counsel appealed to the court and to the attorney representing the Schaibles to help him when he found his improper questions blocked by objections of the prosecution. By contrast, on other occasions, counsel refused to accept the advice of the court, or to follow examples set by the other attorney. When the utter futility that was at times manifested by counsel is considered, together with the meager evidence of in-

sanity that reached the jury, it is difficult to say defendants were given effective assistance in presenting their defense.

Perhaps the most startling revelation in the 2250-page record before us is that the defendants' counsel made no objections throughout the entire trial. As a result we find statements made by the Schaible brothers, oral and written, were admitted in evidence against the defendants even though they neither assented to nor were present when those statements were made. (See: 14 I.L.P., Criminal Law, sec. 412.) Similarily, separate statements of the defendants were admitted in evidence with no effort to restrict their application to the individual making the statement. This omission of counsel occurred despite the fact that the Schaibles' attorney moved for the court to instruct the jury that the statements made by the defendants were not admissible against his clients. Under the circumstances existing at the trial an additional lapse on the part of defendants' counsel occurred when he failed to seek a hearing regarding the voluntary nature of the statements given by the defendants, and when he made no effort to put their credibility in issue before the jury. This failure was particularly damaging in view of counsel's representations to the jury panel on the *voir dire* that he would prove the statements had been procured by "brainwashing" and by "Russian purge methods." Having planted this thought in the minds of the jurors, counsel's neglect to make any effort to prove such charges doubtless resulted in the jurors accepting the statements as unqualified confessions that the defendants committed the crime. If, as the record suggests in numerous instances, the voluntary nature of the statements was in doubt, defendants were entitled to a complete exploration of the matter under any concept of competent defense. Cf. *People* v. *Schulman*, 299 Ill. 125.

The manner and scope of counsel's cross-examination of some of the witnesses for the prosecution is, we believe, also indicative of incompetency in the conduct of the de-

fense. Here again counsel elicited information which was never shown to have any bearing on the question of defendants' sanity, but which would, rather, inform the jury that defendants were evil men and hardened criminals. For example, counsel brought out by such cross-examination that Gordon DeSimone had been arrested many times, that he had committed numerous burglaries before and after the murder here involved, that he had once been placed on probation for auto theft, and that he had served a term in the penitentiary on three charges of burglary. In the same manner the jurors were informed that James DeSimone had been subject to previous criminal charges.

In appraising the effectiveness of defendants' representation at all stages of the trial, something must be said of counsel's conduct of the *voir dire* and of his opening and closing remarks to the jury. While examining prospective jurors many irrelevant and ludicrous questions were asked, among them being: "Have you ever seen a play called 'Darkness in the Noon'?" "Did you ever contribute to the Polio Fund?" "Do you ever dream?" "Do you believe in the competitive system, the American competitive system?" "Now in speaking the German language are you aware that in old Russian and old German, that the languages are identical?" "Do you know the origin of the word 'hospital,' it means 'spit house'." "Have you any idea what the word 'Amen' means?" "Have you read anything by the Catholic monk Salirou?" "Did you ever read Omar Khayyam stories?" "Did you ever hear of anything concerning the Latin poet, Juvenal?" "Did you ever hear of the Greek historian Thucydides?" "Did you see the movie called 'The Egyptian'?" "Did you ever hear of Nafir Titi, the wife of Tato Ahmen Pharoah?" "Do you know why the American colonies rebelled against George the 3rd?" When counsel was questioned concerning what bearing the answers to some of such questions would have upon his right to intelligently exercise a peremptory chal-

lenge, he admitted to the court that he did not know. Their purpose likewise escapes this court and it is our opinion that the persistent use of such seemingly senseless questions could only have operated to the detriment of the defendants by causing their counsel to appear absurd in the eyes of the jurors.

Criticism of counsel's opening statement may be confined to the observation that he informed the jury of other crimes committed by the defendants which were wholly unrelated and immaterial to the charge for which they were being tried, or to the defense of insanity that was being raised. Here again the effect could only have been to convince the jurors that defendants were likely to commit such a crime as charged. (See: *People* v. *Wilson,* 400 Ill. 461; *People* v. *Gougas,* 410 Ill. 235.) Counsel's closing remarks to the jury likewise wandered to many irrelevant and confusing matters and, to a greater extent than seems reasonable, were used to suggest to the jury that defense counsel were overmatched by the prosecutors, that they were not capable of defending a criminal case, that their clients were guilty, and that there was, in fact, no legal defense which could be made for defendants. It is true a great portion of the closing argument concerned the subject of insanity but we fail to find that there was any clear or intelligent correlation of counsel's theories with the facts of the case in a manner that could be understood by the jurors. We think too that counsel's action of suggesting to the jury in several instances that Gordon DeSimone should receive a death sentence if the defense of insanity did not prevail, was inconsistent with the best interests and effective representation of his client.

To meet the charge that the incompetency of counsel denied defendants due process of law, the People urge that the unorthodox defense presented was a desperate gamble engaged in by counsel in the face of almost certain conviction of his clients. The failure of such defense, it is

said, is not justification for charging that the trial was reduced to a sham or a farce. With this we can agree, but the argument overlooks that it is likewise held to be a denial of due process where the representation of a defendant is of such low caliber as to amount to no representation at all. (See: *People* v. *Stephens,* 6 Ill.2d 257; *United States ex rel. Feeley,* v. *Ragen,* 166 F.2d 976.) Further, we may look to the language of *Betts* v. *Brady,* 316 U.S. 455, 86 L. ed. 1595, 1602, where it is said an asserted denial of due process "is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." While the record here may disclose that counsel, with the lives of his clients being the stake, sought to make a defense of insanity in an unorthodox way, it also shows that his apparent lack of knowledge of basic criminal procedures and rules of evidence resulted in almost a complete failure to develop such a defense. When these shortcomings are considered together with the failure of counsel to acquaint himself with the testimony of his witnesses, his failure to make timely objections, and the picture of utter futility he at times presented to the court and jury, we must hold that the totality of such facts is that defendants were denied the effective representation contemplated by the guarantees of due process. This reason alone impels us to reverse the judgments of conviction in order that defendants may have an opportunity for a new trial with competent representation.

It is contended that the alleged incompetency of counsel should not serve as a basis for reversal where the evidence of the People is conclusive, and the judgments are manifestly and unquestionably right. A complete answer to such contention is found in *People* v. *Blevins,* 251 Ill. 381, at 393-395, where a similar argument was rejected in these

terms: "It is true, error will not always reverse in criminal cases where the guilt of the accused is conclusively shown, (*People* v. *Cleminson,* 250 Ill. 135,) but to this rule there are some exceptions. In murder cases the jury fixes the punishment to be inflicted, and the legislature has seen fit to allow a wide range in determining what the punishment shall be, the minimum being fourteen years in the penitentiary and the maximum death. In this case the death penalty was fixed by the jury, and it may well be that the weak manner in which plaintiff in error was defended, the vigorous manner in which he was prosecuted by four able and experienced lawyers, and the admission in evidence, on the trial, of incompetent testimony calculated to prejudice and degrade plaintiff in error in the minds of the jury, influenced the jury in determining the punishment that should be inflicted. * * * Whatever view we might entertain of our duty in this case if the punishment had been fixed at less than the maximum, to say that, notwithstanding important rights plaintiff in error was entitled to under the law were not accorded him on the trial and his punishment fixed at death, we think he was not prejudiced, and that the verdict of the jury must have been the same and the punishment fixed at death even if he had been accorded the rights he was entitled to, would be to establish a dangerous precedent and one not justified by the law or the natural instincts of humanity."

Other errors assigned by defendants at this time are not of such nature as will recur upon a new trial and need not be considered here. There is, however, one feature of the record which necessitates further comment. Gordon De-Simone, it appears, refused to enter the courtroom at various stages of the proceedings and thus voluntarily absented himself from his trial. On other occasions the same defendant caused disorder in the court by profane outbursts directed at witnesses and the court, and in one instance seized and tore into shreds an exhibit which had been ac-

cepted in evidence. When one such disorder occurred after the evidence had been closed and just prior to presentation of closing arguments, the court caused the defendant to be removed from the courtroom. He soon returned, however, after some discussion by court and counsel. Looking to decisions which hold that a defendant has the right to be present at every stage of a criminal trial, some contention is made that the action of the court in proceeding during the periods of both voluntary and involuntary absence was a violation of section 9 of article II of our constitution, which ordains that an accused shall have the right to appear and defend in person in all criminal prosecutions.

The constitutional privilege relied upon was conferred for the benefit and protection of an accused. Like many other rights, however, it may be waived. Thus where a defendant voluntarily absents himself from a courtroom and refuses to be present for further proceedings he is deemed to have waived his right and cannot claim any advantage on account of his absence. (*People* v. *Smith,* 6 Ill.2d 414; *People* v. *Connors,* 413 Ill. 386; *Sahlinger* v. *People,* 102 Ill. 241.) The court did not, therefore, exceed its legitimate powers when it proceeded while Gordon DeSimone voluntarily absented himself from the trial. The same result must follow under the circumstances attending this defendant's involuntary absence. It is obvious from the record that defendant's removal was necessary to prevent such misconduct as would obstruct the work of the court; such misconduct was, in turn, effective as a waiver of the defendant's right to be present. The right to appear and defend is not given to a defendant to prevent his trial either by voluntary absence, or by wrongfully obstructing its progress.

For the reason stated the judgments of the criminal court are reversed as to both defendants, and the cause is remanded to that court for a new trial.

*Reversed and remanded.*