**Robert RICKENBACKER, Relator-Appellant,**

v.

**The WARDEN, AUBURN CORRECTION-AL FACILITY, and the People of the State of New York, Respondents-Appellees.**

No. 39, Docket 76–2036.

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1976.

Decided Dec. 22, 1976.

Rehearing and Rehearing En Banc Denied April 5, 1977.

Lillian Z. Cohen, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondents-appellees.

Aaron J. Jaffe, New York City (Molly Colburn, Law Student, on the brief), for relator-appellant.

Before SMITH, OAKES and MESKILL, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Robert Rickenbacker appeals from the denial of his petition for a writ of habeas corpus by the United States District Court for the Eastern District of New York, Thomas C. Platt, Jr., *Judge.* On appeal Rickenbacker's sole claim is that his counsel at his trial for murder was so incompetent as to violate his sixth amendment rights. We find no error and affirm the denial of his petition.

I.

About 6:30 p. m. on July 30, 1970 three men entered a grocery store in Brooklyn. During the ensuing robbery a man helping the store owner was killed. Two nearby New York City patrolmen, Thomas Walsh and Donald Scannapieco, heard shots and went toward the store. They saw three men running in the direction of a parked gypsy taxi containing a fourth man. Scannapieco arrested one of the three robbers and the man in the taxi. Walsh chased the other two men through the streets and a store, first in his patrol car and then on foot. He captured one robber, and the other one escaped. The police were told that the escapee was Rickenbacker and that he lived at 63 Decatur Street in Brooklyn. Police went to that address and were unable to locate Rickenbacker, despite a search of the neighborhood. About eight months later, on March 11, 1971, Detective Robert Mashall, who was in charge of the investigation, saw appellant in the police station while he was in custody for another unrelated offense. Marshall asked him his

name and address. When he responded Robert Rickenbacker, 63 Decatur Street, he was arrested.

The driver of the parked car pleaded guilty to a lesser offense during the first trial in May, 1971. While the jury could not agree on a verdict as to Rickenbacker, it found the other two men guilty of murder. At Rickenbacker's second trial in October, 1971 he was represented by Joseph Lombardo, another court-appointed attorney. At the second trial, in New York Supreme Court (Kings County), the jury deliberated less than two hours and found him guilty of murder. He was sentenced to 25 years to life imprisonment and is currently confined in Auburn Correctional Facility.

His conviction was affirmed without opinion by the Appellate Division, Second Department, and leave to appeal to the New York Court of Appeals was denied on November 14, 1974. He then filed a petition for a writ of habeas corpus, which was denied by Judge Platt on February 24, 1976.

### II.

Rickenbacker argues that his attorney's incompetence is shown by (1) his failure to make an opening statement, (2) his failure to object to the introduction of a gun, (3) his failure to object to portions of the charge to the jury, (4) his inadequate cross-examination, (5) his ineffective closing argument, and (6) his failure to object to portions of the government's closing argument. While we find no merit in the first three claims, the last three raise troublesome issues.

The testimony at the trial took some two hours to present. The government presented seven witnesses, and Rickenbacker presented none.

Sam Fichera, the owner of the store, testified and described the robbery. He said he was able to identify only two of the robbers, Morgan and Ferguson, and that Morgan had had a gun. On cross-examination he answered nine questions about the gun he owned and which he had fired at the robbers while pursuing them.[1]

Michael Petrancosta, who was helping Fichera at the time of the robbery and who is the son of the victim, testified and described the robbery. He said he was able to identify one robber, Morgan, and that Morgan had had a gun. There was no cross-examination.

Patrolman Thomas Moore testified that he saw the victim after the robbery and that he was dead. There was no cross-examination.

Patrolman Walsh testified and said he saw three men running toward the taxi and that two, Morgan and Rickenbacker, were carrying guns. He described the chase and

---

1. The entire cross-examination of Fichera was:

Q. Did you say you own a 38 Smith and Wesson? A. Yes.

Q. After this incident that you've testified to, was that weapon ever examined ballistically by the Police Department? A. They did. Somebody that came at—the Police Department checked it out.

THE COURT: Did someone examine it, yes or no?

THE WITNESS: Yes, at the Police Department.

Q. By examining it, did they fire the gun? A. I don't know.

MR. SCHMIER: Objection, your Honor.

THE COURT: Objection sustained.

Q. What did you see them do?

MR. SCHMIER: Objection.

THE COURT: They examined it, he said.

A. I handed them the gun and they went in another room and I don't know what happened.

Q. How long did they have the gun? A. What's that?

Q. How long did they have the gun? A. Not long, about half an hour after I was being questioned at the police station.

Q. And—

THE COURT: (int'g) They gave the gun back to you?

THE WITNESS: Right.

Q. They gave the gun back to you? A. Yes.

Q. Did you hear the gun being fired at any time?

MR. SCHMIER: Objection, your Honor.

THE COURT: You heard the gun fired when you fired it? You say you fired two shots?

MR. LOMBARDO: I don't mean that, your Honor. While the police had it.

THE COURT: Objection sustained.

MR. LOMBARDO: I have no further questions.

identified Rickenbacker as the person who had eluded him. He said that during the chase Rickenbacker threw a gun between the two parked cars. The gun was later retrieved and was introduced in evidence. On cross-examination Walsh answered nine questions and said that during the chase, which lasted three or four minutes, the robbers were running fast and that he had turned possibly five corners.[2]

Patrolman Scannapieco testified that he saw three men run toward the taxi and that two, Morgan and Rickenbacker, were carrying guns. He said that Rickenbacker ran within 20 feet of him and that he saw his face. He then identified Rickenbacker. On cross-examination he answered seven questions and said all three robbers were male Negroes.[3]

Detective Marshall testified that he searched 63 Decatur Street and other places in the neighborhood for about a month and was unable to find Rickenbacker and that when he was arrested on March 11 Ricken-backer gave 63 Decatur Street as his home address. On cross-examination he answered four questions and said that the first time he had ever seen Rickenbacker was on March 11 at the Brooklyn police station.[4]

The identification testimony concerning Rickenbacker was essentially the same as in the first trial, in which the jury failed to agree. In the second trial the state for the first time brought in the evidence of Rickenbacker's absence from his usual haunts on a theory of flight to avoid prosecution. Lombardo succeeded in keeping out evidence the state sought to adduce that Rickenbacker had failed to make his weekly report to his parole officer during the eight months between the holdup and his arrest.

Dr. Wald, the medical examiner, testified that the victim died from a gunshot wound. There was no cross-examination.

At the close of the state's case Rickenbacker's attorney told the court that Rickenbacker wanted to call some witnesses. After some discussion between Rickenback-

---

2. The entire cross-examination of Walsh was:

Q. Officer, during the time that you say you were chasing these two men, at any time were they walking or were they always running? A. Always running.

Q. So, in answer to Mr. Schmier's question, when you said it was a chase, it was, in effect, a chase, they were running and you were chasing; is that correct? A. Yes, sir.

Q. And were they running, in your opinion, as fast as they could? A. They were running fast.

Q. They were running fast. Did I understand you to testify that at one point you got into your car after you had seen the two men running away and turned the corner to chase them; is that correct? A. Yes, sir.

Q. Now, did you turn a corner more than once while you were chasing them? A. Yes.

Q. How many times? A. In total possibly five times.

Q. All right. Could you tell me, sir, how much time elapsed from the time you first saw the three defendants until the time that you apprehended the one defendant you have told us about? A. From the initial time I saw them until I apprehended Ferguson?

Q. Yes, sir. A. Three or four minutes, possibly.

Q. That would be your best estimate; is that correct? A. Yes, approximately I would have to say.

MR. LOMBARDO: No further questions.

3. The entire cross-examination of Scannapieco was:

Q. Officer, these three men that you say you first saw running in your direction, were they all the same color? A. Color, sir?

Q. Yes, were they all black? A. All male Negroes.

Q. All male Negroes. When you first saw them, were they running in your direction? A. Yes, sir.

Q. And then the other two turned and ran back away from you, is that your testimony? A. Which other two, sir?

Q. The two that did not get into the car. A. Yes, sir, they turned.

Q. They turned and ran; is that correct? A. Yes, sir.

Q. And your partner then gave chase? A. Correct, sir.

MR. LOMBARDO: No further questions.

4. The entire cross-examination of Marshall was:

Q. Officer, did I understand you to say that when you first saw the defendant, you saw him at a police station? A. Yes, I did.

Q. When was that? A. March 11th of this year.

Q. In Brooklyn? A. Sixty-seventh Precinct in Snyder Avenue.

Q. Do you know whether or not he had been arrested in Brooklyn? A. Yes, sir.

MR. LOMBARDO: No further questions.

er and his attorney, the defense decided not to call any witnesses.

Rickenbacker's attorney gave a brief (13 double-spaced typed pages) summation in which he stressed the failure of the state to introduce any fingerprints from the gun Rickenbacker allegedly threw between the two parked cars, the failure of Fichera and Petrancosta to identify Rickenbacker, the circumstances under which Walsh and Scannapieco saw the robber during the chase, the meager efforts the police made to find Rickenbacker, and the fact that Rickenbacker was later found in Brooklyn.

The state's closing argument emphasized Rickenbacker's flight from his home and the reliability of the identification by Walsh and Scannapieco. During his argument the prosecutor said, without objection, "if one juror is fooled, the People have lost the case and I don't mean lose like Baltimore losing to Pittsburgh. We've lost on behalf of the People of the State of New York, to bring a defendant to justice whom the People feel merits justice in the form of a guilty verdict."

### III.

Rickenbacker concedes that in this circuit the standard for inadequate counsel was enunciated in *United States v. Wight,* 176 F.2d 376, 379 (2d Cir. 1949), *cert. denied,* 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950). "[U]nless the purported representation by counsel was such as to make the trial a farce and a mockery of justice, mere allegations of incompetency or inefficiency of counsel will not ordinarily suffice as grounds for the issuance of a writ of habeas corpus . . . .. A lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." This court has reaffirmed this standard numerous times in recent years. *Lunz v. Henderson,* 533 F.2d 1322, 1327 (2d Cir. 1976); *United States v. Yanishefsky,* 500 F.2d 1327, 1333 (2d Cir. 1974); *United States ex rel. Walker v. Henderson,* 492 F.2d 1311, 1312 (2d Cir.), *cert. denied,* 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144 (1974); *United States v. Sanchez,* 483 F.2d 1052 (2d Cir. 1973), *cert. denied,* 415 U.S. 991, 94 S.Ct. 1590, 39 L.Ed.2d 888 (1974); *United States ex rel. Marcelin v. Mancusi,* 462 F.2d 36, 42 (2d Cir. 1972), *cert. denied,* 410 U.S. 917, 93 S.Ct. 977, 35 L.Ed.2d 279 (1973); *United States ex rel. Scott v. Mancusi,* 429 F.2d 104, 109 (2d Cir.), *cert. denied,* 402 U.S. 909, 91 S.Ct. 1385, 28 L.Ed.2d 651 (1971); *United States v. Katz,* 425 F.2d 928, 930–31 (2d Cir. 1970).

We agree with Judge Platt that by the *Wight* standard Rickenbacker's attorney was not so incompetent as to warrant reversing Rickenbacker's conviction.

*Wight* is based on the due process clause of the fifth amendment and the assistance of counsel clause of the sixth amendment. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) and its progeny rest on the sixth and fourteenth amendments. *Scott v. United States,* 138 U.S.App.D.C. 339, 427 F.2d 609, 610 (1970) (per curiam).

Rickenbacker invites this court to follow other courts in rejecting the "farce and mockery" standard. The District of Columbia Circuit, which originated the "farce and mockery" standard in *Diggs v. Welch,* 80 U.S.App.D.C. 5, 148 F.2d 667, *cert. denied,* 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002 (1945), has now said that the test is whether the defendant had "reasonably competent assistance of an attorney acting as his diligent conscientious advocate." *United States v. DeCoster,* 159 U.S.App.D.C. 326, 487 F.2d 1197, 1202 (1973). The Third Circuit says "the standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place." *Moore v. United States,* 432 F.2d 730, 736 (3d Cir. 1970) (*en banc*). The Fifth Circuit has said the test is having "counsel reasonably likely to render *and rendering* reasonably effective assistance." *United States v. Fessel,* 531 F.2d 1275, 1278 (5th Cir. 1976). The Sixth Circuit has also adopted this standard. *United States v. Toney,* 527 F.2d 716, 720 (6th Cir. 1975). The Seventh Circuit has said that the attor-

ney's performance must meet "a minimum professional standard." *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir.), *cert. denied sub nom. Sielaff, Corrections Director v. Williams,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). The Eighth Circuit has said "the standard would be to test for the degree of competence prevailing among those licensed to practice before the bar." *Johnson v. United States,* 506 F.2d 640, 646 (8th Cir.), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 659 (1974).

In the context of cases where a defendant claims he pleaded guilty because he had incompetent counsel, the Supreme Court has held that the defendant must show that his attorney's advice was "outside the 'range of competence demanded of attorneys in criminal cases.'" *Tollett v. Henderson,* 411 U.S. 258, 268, 93 S.Ct. 1602, 1609, 36 L.Ed.2d 235 (1973), quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

### IV.

■ It may be that this court should reconsider the standard set forth in *Wight.* But we need not decide this issue now, for we conclude that the performance of Rickenbacker's counsel does not fail to meet any of the suggested standards, all of which involve the heavy burden of establishing incompetence.

Review of the records of the two trials reveals apparent weaknesses in Lombardo's performance. Walsh's testimony in the first trial measured the time Rickenbacker was in his sight during the chase in seconds, in the second trial at three or four minutes possibly. Lombardo did not focus in cross-examination on the time discrepancy, but brought out the fast running and the corners turned. While Lombardo sought unsuccessfully a second *Wade* hearing on the claim that Walsh's identification was tainted by the circumstances of his observation of a photograph of Rickenbacker after the chase and before identification at the trial, he chose not to explore the subject on cross-examination.

Lombardo was unsuccessful in keeping from the jury evidence from which the jury could infer that Rickenbacker was in flight or hiding for some eight months after the crime, although he did succeed in keeping out proffered evidence that Rickenbacker had failed to make required weekly reports to his parole officer during the period.

Lombardo's summation, while somewhat longer than that of counsel in the first trial, covered only 13 pages of transcript. It did however argue the questions of identification and flight and there is no way we can really assess the manner of its delivery or its impact. The jury did call for the reading of the full testimony of Officers Walsh and Scannapieco, the identifying witnesses.

■ Rickenbacker's attorney had access to the transcripts of the first trial and the prior hearing called for by *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Reading the results of past cross-examination of the state's witnesses, Rickenbacker's attorney may reasonably have concluded that more extensive cross-examination would strengthen rather than weaken the state's case. His closing argument, while brief, did discuss all the important points the jury should consider. The prosecutor's remark in summation was objectionable and should have called forth a protest and request for censure. To other remarks Lombardo did object. That he let one slip by is not, we think, sufficient to establish incompetence. The courts cannot guarantee errorless counsel or counsel who cannot be made to seem ineffective by hindsight. The fact that "the case could have been better tried" is not sufficient reason to sustain appellant's claim. *United States v. Katz,* 425 F.2d at 931. Both the trial judge and the habeas corpus judge considered the performance of Lombardo, with whose competence they were familiar, satisfactory.[5]

---

5. Professional integrity, not financial reward, is currently the only incentive for an experienced attorney to prepare thoroughly when he acts as appointed counsel. The record indicates that Rickenbacker's appointed attorney received a fee of "$500 or $750" (Appendix, S–11).

We cannot say that his performance was outside the required level of competence.

Affirmed.

OAKES, Circuit Judge (dissenting):

I agree that, in all probability, Rickenbacker's defense counsel's performance, while hopelessly inept, was probably not a "farce and mockery" within the long line of cases in this circuit referred to by the majority, despite such features as "cross" examinations of the key prosecution witnesses that served only to give the witnesses an opportunity to repeat their direct testimony. But, particularly in view of this court's promotion of higher standards of advocacy, in the wake of Chief Judge Kaufman's well-chosen remarks,[1] I think the time has come to follow the lead of the six other circuits (including the originating circuit) that have rejected the rule of *Diggs v. Welch,* 80 U.S.App.D.C. 5, 148 F.2d 667, *cert. denied,* 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002 (1945). And I cannot agree that counsel's performance here was up to the standard of reasonable competency to which the better rule speaks.

Judge Smith for the majority has, as always, stated the facts fully and fairly, so they need not be restated. In my view it was unreasonably incompetent for appellant's counsel not to drive home the fact that neither Fichera, the store owner, nor Petrancosta, the victim's son, could identify the defendant and not to query Officer Walsh regarding the weapon he said he had found, the absence of fingerprints on it, and his opportunities for observation of the third man during the chase. Counsel did not even object to the introduction of the weapon. These examples could be multiplied; I need not belabor the point, as I think footnotes 1–4 of the majority opinion are almost self-compelling. When these are considered along with the facially absurd proposition advanced by counsel in summation, that perhaps it was a shot from Fichera's own weapon that killed Vito Petrancosta, it is a wonder that the jury took as long as it did to convict.

*United States v. Wight,* 176 F.2d 376 (2d Cir. 1949), *cert. denied,* 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950), the case that established our circuit's "farce and mockery" standard, followed *Diggs* and its District of Columbia Circuit progeny and *United States ex rel. Feeley v. Ragen,* 166 F.2d 976 (7th Cir. 1948), which also relied on *Diggs, id.* at 981. As the majority opinion recognizes, both the District of Columbia and Seventh Circuits, along with four others, have now abandoned this standard. *Diggs* simply cannot withstand analysis. The Supreme Court cases on which it relied, 148 F.2d at 669 n. 3,[2] all held that, where the trial proceedings had been turned into a farce or mockery of justice, a conviction could not stand; none held that the proceedings *must* have come to that point to warrant judicial intervention. The principal rationale advanced in *Diggs, id.* at 670, that "[i]n many cases there is no written transcript," thereby giving a habeas petitioner "a clear field for the exercise of his imagination" (and thereby presumably inundating the federal courts), no longer holds true, since written transcripts are now generally available. Gideon's Trumpet

---

1. *See, e. g.,* Kaufman, *The Court Needs a Friend in Court,* 60 A.B.A.J. 175 (1974); *New Admission Rules Proposed for Federal District Courts,* 61 A.B.A.J. 945 (1975) (summary of work of advisory committee to Second Circuit Judicial Conference and of advocacy qualifications for admission to Second Circuit bar). *See also* Burger, *The Special Skills of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?,* 42 Fordham L.Rev. 227 (1973).

2. The five cases cited were *Moore v. Dempsey,* 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923) (mob violence); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (mob violence; no counsel appointed); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (knowing use of perjured testimony by prosecutor; writ not issued for failure to exhaust state remedies); *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (coerced confession); and *Johnson v. Zerbst,*

has long since sounded.[3] We should join the several other circuits that have rejected *Diggs* as no longer having precedential value and declare it a dead letter, bringing the law of our circuit into line with the rule of, *e. g., United States v. DeCoster*, 159 U.S. App.D.C. 326, 487 F.2d 1197 (1973), that, under the Sixth Amendment, "a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate," *id.* at 1202 (emphasis omitted). *See also* Finer, *Ineffective Assistance of Counsel*, 58 Cornell L.Rev. 1077 (1973); Waltz, *Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal Cases*, 59 Nw.U.L.Rev. 289 (1964); Note, *Effective Assistance of Counsel for the Indigent Defendant*, 78 Harv.L.Rev. 1434 (1965).

Forty-four years ago, Mr. Justice Sutherland wrote: "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). In 1976 I think our court should recognize that the right is equally meaningless if counsel is not at least reasonably competent.

I dissent.

304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (no counsel at trial).

**3.** *See Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); A. Lewis, *Gideon's Trumpet* (1964).