UNITED STATES of America, Appellee,

v.

Al TAYLOR et al., Appellants.

Nos. 330–334 and 336, Dockets 76–1210, 76–1256, 76–1264–66 and 76–1288.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1976.

Decided April 13, 1977.

Certiorari Denied in No. 76–1288 June 20, 1977.

See 97 S.Ct. 2958.

Certiorari Denied in Nos. 76–1264 to 76–1266 Oct. 3, 1977.

See 98 S.Ct. 170.

John A. Ciampa, New York City, for appellant Taylor.

Nancy Rosner, New York City, for appellant Turner.

Lawrence H. Levner, New York City, for appellant Ramsey.

Eleanor Jackson Piel, New York City, for appellant Wesley.

Harold Schwartz, Brooklyn, N. Y., for appellant Green.

Harry R. Pollak, New York City, for appellant Salley.

Thomas E. Engel, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., John S. Siffert, Martin B. McNamara, Audrey Strauss, Asst. U. S. At-

tys., New York City, of counsel), for appellee.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

The six appellants before us were among 17 defendants indicted for conspiracy to violate the federal narcotics laws in particular 21 U.S.C. §§ 846, 812, 841(a)(1), 841(b)(1)(A). All appellants were convicted on the conspiracy count after a nine-week jury trial in the United States District Court for the Southern District of New York, Kevin Thomas Duffy, *Judge*. Appellants Wesley and Green were also convicted on substantive counts, for distributing one-half and one-quarter kilogram of heroin, respectively. Sentences were imposed in May and June of 1976.[1] The appellants raise numerous claims in respect to the proof, the conduct of the trial, and the selection of, charge to, and court's communications with the jury. We affirm.

## I. NATURE OF THE CONSPIRACY

The narcotics conspiracy involved in this appeal is, in the Government's words, "an extension" of that involved in *United States v. Tramunti*, 513 F.2d 1087 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). The conspiracy alleged was that, from January 1, 1969, to December 6, 1973 (the same dates involved in *Tramunti*, *see id.* at 1093), the indicted defendants, together with Warren Robinson, Frank Pugliese and others, conspired to receive, buy, and sell, and to facilitate the transportation, concealment and sale of, unlawfully imported narcotics drugs and to distribute and possess with intent to distribute narcotic drug controlled substances. All of the 37 overt acts alleged in the indictment took place between March of 1971 and October of 1972, except for two overt acts allegedly occurring in June and October of 1973. The Government's proof primarily consisted of testimony by Harry Pannirello, Jimmy Provitera and Thomas "Tennessee" Dawson, very similar to their testimony in *Tramunti*, *supra*, *see id.* at 1097–98, and by two defendants who pleaded guilty, James March and Dorethea Ann Ellis. Broadly speaking, the proof was that Pugliese was the source of narcotics wholesaled by Warren Robinson in Washington, D. C., and Al Green in New York. The appellants other than Green were all either customers of Robinson and his partner, Dawson, in the Washington, D. C., area (appellants Taylor, Turner and Ramsey), or persons who assisted Robinson and Dawson in transporting, storing, diluting and delivering heroin in Washington (appellants Salley and Wesley).

In 1971, both Pugliese and his key lieutenant, Paul DiGregorio, went to jail, with Pugliese designating Pannirello and a Pat Dilacio to run the business in his absence. Commencing in January, 1972, Pannirello used his brother-in-law, Provitera, to make deliveries. Robinson's Washington operation and at least two of Pugliese's New York customers, appellant Green and fugitive defendant Basil Hansen, continued to deal with Pannirello and Dilacio on the same basis as they had with Pugliese. Thus the core group of the alleged conspiracy consisted of Pugliese, DiGregorio, Pannirello and Dilacio, a group that served, in the Government's term, as the "hub"[2] around

---

1. The sentences imposed by Judge Duffy were as follows:

| Defendant | Term of Imprisonment |
|---|---|
| Al Taylor | Eight years to be followed by a six-year term of special parole. |
| William Turner | Fifteen years to be followed by a six-year term of special parole, to run concurrently with a ten-year sentence imposed August 15, 1973, in the District of Maryland, for income tax evasion. |
| Charles Ramsey | Fifteen years' imprisonment to be followed by a three-year term of special parole. |
| Rufus Wesley | Eight years to be followed by a three-year term of special parole. |
| Al Green | Eight years to be followed by a three-year term of special parole. |
| Henry Salley | Five years to be followed by a three-year term of special parole. |

2. We take note of the Fifth Circuit's view of the use of metaphors in conspiracy cases:

which multikilogram quantities of narcotics were purchased and distributed.

## II. THE CONSPIRACY CONVICTIONS

All appellants except Ramsey raise points relating to either the scope of the conspiracy (*i. e.*, that the evidence showed multiple conspiracies, rather than the single conspiracy alleged in the indictment) and the charge thereon, or the sufficiency of the evidence of their participation in the conspiracy, or both. We will first consider the multiple conspiracy issue and the charge given, then examine the sufficiency of the evidence as to each appellant.

### A. *Single v. Multiple Conspiracies*

We have recently recognized that, "[w]hen a pattern of illegal activity persists over an extended period of time, with participants moving on and off the scene of action, it is sometimes difficult to establish that they are all part of a single conspiracy." *United States v. Armedo-Sarmiento,* 545 F.2d 785, 789 (2d Cir. 1976). It is the Government's burden to establish the conspiracy alleged in the indictment, and whether this burden has been met "is ordinarily a question of fact for the jury," *id.* at 309. Our task on review is to determine whether the legal standard given to the jury by the trial court in its charge was correct and whether, viewing the proof in the light most favorable to the Government, there was sufficient evidence to permit the jury to find the single conspiracy alleged.

■ Judge Duffy's charge on multiple conspiracies was virtually identical to the one he used in *Tramunti, supra,* which is reproduced in 513 F.2d at 1107. We held that charge "clear, correct and within the decided cases." *Id.* The charge here cor-

rectly told the jurors that they had to acquit unless they found the existence of the conspiracy charged in the indictment and found that each defendant they convicted was a member of that conspiracy. Appellant Wesley requested a supplemental charge to the effect that, if multiple conspiracies were in fact proved, all defendants were to be acquitted, regardless of whether the conspiracy charged in the indictment had been proved. The trial court properly denied this request; it is an incorrect statement of the law. *See United States v. Lam Lek Chong,* 544 F.2d 58, 68 (2d Cir. 1976); *United States v. Tramunti, supra,* 513 F.2d at 1107–08.

■ On the question whether the conspiracy charged was sufficiently proved as a whole—we consider whether it was sufficiently proved as to each defendant in the following subsection, *infra*—the discussion in *Tramunti* is relevant. There, as here, appellants had a common source of heroin supply, here the Pugliese operation, and there was proof of "mutual dependence and assistance." 513 F.2d at 1106. While appellants had their principal operations in two cities—New York (appellant Green) and Washington (all others)—the evidence of a common source of supply justified "treatment of the two spheres as one general business venture", *id.* There was here, moreover, a "consistency of personnel, method and type of operation", *United States v. Hinton,* 543 F.2d 1002, 1014 (2d Cir. 1976), from which the jury could have found a single venture. As we have recently recognized, "[m]ost narcotics networks involve loosely knit vertically-integrated combinations", *United States v. Panebianco,* 543 F.2d 447, 452 (2d Cir. 1976), and such a combination could reasonably have been found here. *See generally* Note, *Resolution*

As for us, the problem is difficult enough without trying to compress it into figurative analogies. Conspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains, or any one or all of today's galaxy of mechanical[,] molecular or atomic forms.

*United States v. Perez,* 489 F.2d 51, 59 n.11 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). *See also United States v. Borelli,* 336 F.2d 376, 383–84 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). *But see, e. g., United States v. Sperling,* 506 F.2d 1323, 1330 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).

*of the Multiple Conspiracies Issue Via a "Nature of the Enterprise" Analysis: The Resurrection of Agreement,* 42 Brooklyn L.Rev. 243 (1975).

## B. *The Individual Appellants and the Charged Conspiracy*

 Before turning to an examination of the proof adduced as to each appellant, a few established principles should be restated. First, "the gist of the offense [of conspiracy] remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *United States v. Borelli,* 336 F.2d 376, 384 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). In making this determination, courts often look to such factors as knowledge and dependency as evidence of an agreement. These factors, in turn, may be inferred from an assessment of the nature of the criminal enterprise and the defendant's role in it, since "it would be unrealistic to assume that major producers, importers, wholesalers or retailers [of narcotics] do not know that their actions are inextricably linked to a large on-going plan or conspiracy." *United States v. Arroyo,* 494 F.2d 1316, 1319 (2d Cir.), *cert. denied,* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); *see United States v. Ortega-Alvarez,* 506 F.2d 455, 457 (2d Cir. 1974) (per curiam), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975); *United States v. Mallah,* 503 F.2d 971, 983–84 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. Bynum,* 485 F.2d 490, 495–96 (2d Cir. 1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); Note, *supra,* 42 Brooklyn L.Rev. at 256–57, *citing United States v. Bruno,* 105 F.2d 921 (2d Cir.), *rev'd on other grounds,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). For such an inference to be drawn, however, it is necessary to examine "the qualitative nature of the act or acts [of each defendant] . . . in the context of the entire conspiracy . . . ." *United States v. Torres,* 503 F.2d 1120, 1124 (2d Cir. 1974).

 1. *Wesley.* Viewing the relevant conspiracy as one grounded in the New York distributing operation of Pugliese and his lieutenants, we have no difficulty in concluding that the evidence was sufficient to convict appellant Wesley as a member of that conspiracy.

Dawson met Wesley in early 1971 through Robinson, who persuaded Dawson to hire Wesley to work at Dawson's bar. Wesley not only accompanied Dawson and sometimes Robinson to New York and New Jersey, where they purchased multikilogram quantities of heroin from the Pugliese operation, but he also allowed his Maryland apartment to be used for the cutting and storing of the heroin. He picked up some drugs from Pannirello in New Jersey without making full payment, so that Dawson later had to reimburse Pannirello. Wesley's knowledge of the overall enterprise could properly have been inferred from his considerable dealings.

2. *Salley.* Appellant Salley was also closely connected with Robinson. His house was used to cut and store heroin, and he traveled to New Jersey with March to pick up heroin from Pannirello. Later, he went with Robinson to New Jersey for meetings with Pannirello and Provitera; Robinson told them that Salley was working for him and that Provitera should deliver to Salley. Within two weeks after one such meeting, Salley obtained a package of heroin at a Howard Johnson's Motel in New Jersey from Provitera. He otherwise participated in Robinson transactions sufficiently so that the jury could have readily inferred that he was fully aware of Robinson's dealings and the size and scope of the conspiracy.

 3. *Taylor.* Appellant Taylor's case is more difficult. There was no evidence linking him to New York, and there was direct evidence of only two conspiracy-related drug transactions, involving a total of two to two and one-half ounces. While such proof is qualitatively quite weak in the context of the entire conspiracy, *see United States v. Tramunti, supra,* 513 F.2d at 1112, it was sufficient within *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969),

*cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and its progeny to permit the introduction of Dawson's hearsay testimony, which made Taylor out to be a regular, if slow-paying, customer of Robinson's and one of his principal customers in 1971. *See United States v. Stanchich*, 550 F.2d 1294, 1297–1299, n. 4 (2d Cir. 1977). From Dawson's testimony, which indicated that Taylor was purchasing sufficient quantities to be in the retail distribution business, the jury could have inferred that he was knowledgeable as to the size of Robinson's operations and the source of Robinson's heroin. *See United States v. Ortega-Alvarez, supra,* 506 F.2d at 457, and authorities cited therein.

■ 4. *Turner.* Appellant Turner claims that there was insufficient nonhearsay evidence to justify the submission of his case to the jury and that his "single act"— going to Robinson's apartment in Maryland, sampling three different piles of narcotics that Robinson and Dawson were cutting on the table, and saying that, if the narcotics were good, he and his friends would buy all that Robinson and Dawson could supply— was insufficient to show willing and knowing participation in the conspiracy. But the visit to Robinson's apartment does show that Turner was at least considering becoming a quantity customer of Robinson and Dawson in connection with conspiracy narcotics. There was further direct, nonhearsay evidence that Turner frequently visited Robinson's men's clothing store, where the latter carried on many of his narcotics transactions, and that Dawson and Robinson visited Turner's home. Taken together, this evidence was sufficient under *United States v. Geaney, supra*, to make admissible the hearsay declarations of Robinson, testified to by Dawson and March, that the purpose of Turner's visits to the clothing store was related to narcotics transactions. There were two other instances specified by

March, but these transactions were sales *by Turner to Robinson* and hence did not involve conspiracy narcotics; they demonstrated only that Turner and Robinson knew each other as narcotics operators. But Dawson and March also testified as to a transaction taking place in New York involving the sale by Robinson to Turner of a kilogram of heroin, which was the subject matter of a substantive count on which Turner was acquitted. Robinson and Dawson left Robinson's girlfriend's Bronx apartment in March, 1972, to deliver a kilogram of heroin bought from Pannirello in New Jersey; Robinson told March, who remained at the apartment, that "they were going into town to meet Dog [Turner's nickname]" and "that [i]f he called, to tell Dog, they were on their way." Turner did call the apartment and speak to March, who told him that Robinson was on his way to meet him, and Turner said, according to March, "If Warren gets back tell him I will call him." Robinson and Dawson went to a Manhattan hotel, and, according to Dawson, who waited outside, Robinson went inside with the kilo of narcotics and returned with a bag containing $19,000, Robinson saying that Turner "wanted more narcotics." Upon their return to the Bronx apartment, March told Robinson of Turner's call and Robinson said that "they had met" Turner. Obviously, if the jury credited this evidence, it had more than adequate grounds for finding that Turner was a knowing member of the conspiracy.[3]

5. *Ramsey.* Ramsey, a Washington customer of Robinson's, during the summer of 1971 complained to Dawson that he should have been getting higher quality narcotics than Robinson was delivering to him because he, Ramsey, was "putting up [part of] the front money." He told Dawson that, if Dawson "introduced him to the connection," Ramsey would put up *all* the front money. This alone would probably suffice to tie

---

**3.** Turner does not make the argument that acquittal on the substantive count makes this evidence inadmissible in connection with the conspiracy count, nor could he in the light of *United States v. Sisca*, 503 F.2d 1337, 1344 n.9 (2d Cir.), *cert. denied*, 419 U.S. 1008, 95 S.Ct.

328, 42 L.Ed.2d 283 (1974). *Cf. United States v. Finkelstein*, 526 F.2d 517, 527 (2d Cir. 1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976) (acquittal on conspiracy count does not make evidence inadmissible on substantive count).

Ramsey to the conspiracy, but there was also evidence that in the latter part of October, 1971, after Dawson, Robinson and March had returned from a trip to New York or New Jersey for conspiracy narcotics, Ramsey arrived at the apartment of a Robinson girlfriend in Maryland when the others had cut about a half kilo of the narcotics. Ramsey had an argument with Robinson as to the quantity Ramsey wanted to buy and the money he owed Robinson; he eventually left with one kilo. March's and Dawson's testimony in this regard is sharply challenged by appellant Ramsey, on the basis that they could not have seen Ramsey from the bedroom where Robinson had them hiding while Ramsey was there. But the inconsistencies relied upon were matters for the jury to resolve. *See United States v. Andrino,* 497 F.2d 1103, 1107–08 (9th Cir.), *cert. denied,* 419 U.S. 1048, 95 S.Ct. 621, 42 L.Ed.2d 642 (1974); *United States v. Birnbaum,* 373 F.2d 250, 257 (2d Cir.), *cert. denied,* 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967). There was also evidence that Ramsey made at least one (unsuccessful) effort to buy heroin directly from Pugliese. Taking the evidence in the light most favorable to the Government, as we are required to do after a jury conviction, Ramsey clearly qualifies as a conspirator knowledgeable as to the size, scope and purpose of the conspiracy.

6. *Green.* It is true that appellant Al Green and convicted fugitive codefendant Basil Hansen had no particular connection with Robinson, Dawson and the Washington branch of the Pugliese-Pannirello drug operation. Green and Hansen were, however, major customers of Pugliese and subsequently Pannirello and Provitera, as Pugliese's agents, and both Green and Hansen received substantial deliveries at their apartments in the Bronx. There was testimony that Pugliese himself introduced Pan-

nirello both to Hansen and to Green and told Green that Pannirello would be delivering heroin to Green in the future. Green agreed to the arrangement and thereafter received delivery of two packages from Pannirello. From the quantity of Green's purchases, from his close connections with the suppliers and with another large-scale distributor (Hansen) with the same source (Pugliese), appellant Green must be considered one of those as to whom the jury could infer knowledge both that the conspiracy had a scope, and for its success required an organization, wider than that disclosed by his personal participation, and that there were other major purchasers like Hansen and himself. *See United States v. Aqueci,* 310 F.2d 817, 826 (2d Cir. 1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); *United States v. Mallah, supra,* 503 F.2d at 983–84.

### III. JURY SELECTION

Appellant Wesley raises two points regarding the selection of the jury, one relating to peremptory challenges for alternates, the other relating to the questions asked by the court on voir dire. A third jury selection issue, relating to the role as lead counsel played by counsel for Robinson, who was later severed from the trial, is raised by both Wesley and Green.

#### A. *Challenges for Alternates*

■ Wesley complains that he did not have the additional peremptory challenges for alternates required under Fed.R.Crim.P. 24(c).[4] At a pretrial conference, the court announced that it was going to select a jury of twelve plus four alternates, with all challenges to be exercised "across the board"; Judge Duffy said he would "put sixteen people in the box," with both sides allowed to "challenge anybody you want, alternate or regular juror." He then said, going be-

---

4. Fed.R.Crim.P. 24(c) provides in pertinent part:

Each side is entitled to 1 peremptory challenge in addition to those otherwise allowed by law if 1 or 2 alternate jurors are to be impanelled, 2 peremptory challenges if 3 or 4 alternate jurors are to be impanelled, and 3

peremptory challenges if 5 or 6 alternate jurors are to be impanelled. The additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed by these rules may not be used against an alternate juror.

yond the requirements of Rule 24(c): "The defense, in view of the fact that we do have four alternates, will be given four extra challenges." No one objected at the time to the court's procedure, and Wesley has not shown that he was prejudiced by it.[5] Hence the trial court's procedure must be upheld. We would point out, however, that the better practice would have been to permit separate challenges for alternates, as Rule 24(c) on its face appears to require, thereby preventing use of the extra challenges for alternates as challenges to members of the regular panel.

### B. *Questions on Voir Dire*

■■■■ Wesley also complains about the trial court's failure, when requested, to inquire into the jurors' educational backgrounds and to elicit information about their children, if any. The decision as to the questions to be asked on voir dire largely rests within the informed discretion of the trial judge. *See United States v. Tramunti, supra,* 513 F.2d at 1114; *United States v. Starks,* 515 F.2d 112, 124–25 (3d Cir. 1975); ABA Standards, Trial by Jury § 2.4 and Commentary at 63–67 (Approved Draft 1968). While the extent and range of the questioning must be fair to the parties, so as to enable them to exercise challenges intelligently, it need not cover specific points requested by a particular defendant. *See United States v. Tramunti, supra,* 513 F.2d at 1114; *United States v. Delay,* 500 F.2d 1360, 1366 (8th Cir. 1974). No particular form of questions to be asked need be followed. *See Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *United States v. Staszcuk,* 502 F.2d 875, 881–82 (7th Cir. 1974), *aff'd en banc,* 517 F.2d 53 (7th Cir.), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). There is no contention of overall unfairness here, and the record discloses no abuse of discretion.

### C. *Role of Robinson's Counsel*

■■■■ Appellants Green and Wesley argue that the case of codefendant Warren Robinson should have been severed prior to selection of the jury. The claim is based on the fact that Ivan Fisher, Robinson's attorney, acted as lead defense counsel, exercising in the jury selection process the challenges allowed to defense counsel as a group, while at the time intending to have his client admit the conspiracy and implicate other defendants. This intention, announced out of the jurors' presence on the afternoon of the first day of jury selection, led to defense motions to sever Robinson and eventually, on the fourth day, to his severance. Mr. Fisher's role as lead counsel in the intervening days[6] was not such as could cause prejudice to the other defendants, and no prejudice has been shown. Lead counsel's role was to come to side-bar conferences and to be responsible for seating arrangements; he was also to listen to a juror's wish to be excused on the grounds of hardship. In the one case in which Mr. Fisher approached the side bar alone in connection with a hardship excuse, the juror was excused without defense objection; remaining hardship excuses were heard by the court alone without objection, with each complaining juror excused, a process that is proper under *United States v. Woodner,* 317 F.2d 649, 651 (2d Cir.), *cert. denied,* 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963) (courts hearing hardship excuses altogether out of hearing of defense counsel not remotely prejudicial). Each counsel was permitted to cast his own vote on the peremptory challenges, which is proper, *see United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975), and decisions were made by majority vote. There is no showing that

---

**5.** Indeed, there is some indication in the record and in Wesley's own brief that the additional peremptory challenge Wesley wished to exercise would have been used to challenge a regular juror, not an alternate.

**6.** Prior to Mr. Fisher's announcement, the court presumably had no reason to think he would be

an inappropriate lead counsel. When he was appointed at a pretrial conference, no defendant objected. At the time of the conference, Wesley's counsel had not yet been appointed, but there is no indication that she objected to Mr. Fisher's role at any time near that when she entered the case.

**1356**

Mr. Fisher's participation in any way resulted in improper selection of the jury.

## IV. PROSECUTORIAL CONDUCT

### A. Selective Prosecution

■■■■ Appellant Turner argues that he was selectively prosecuted on a discriminatory basis, invidiously and in bad faith. *See United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974). Evidently he was originally indicted in the District of Columbia in connection with a narcotics conspiracy that allegedly ran from September 1, 1967, to about April 30, 1971; the original and superseding indictments were dismissed on motion of the Government. *See United States v. Lara,* 172 U.S.App.D.C. 60, 520 F.2d 460, 461 (1975). Nine months later a third indictment naming Turner was secured in the Southern District of Florida, but the case was transferred to the District of Columbia on the ground that the Government was "court shopping." *Id.* at 462. That indictment was also dismissed and the dismissal affirmed. *Id.* at 463. Appellant claims that the Government's instant prosecution is in retaliation for his previous successful exercise of his legal and constitutional rights so as to obtain dismissal of the other indictments. We hold that Turner's claim was both untimely and insubstantial. Under Fed.R.Crim.P. 12(b)(1), the defense based on "defects in the institution of the prosecution" must be raised before trial, and Turner's claim was not made until after five weeks of trial. Even on its merits, moreover, the claim lacked substance. While it is true that one day after the dismissal of the indictment by the district court in *United States v. Lara, supra,* Dawson appeared before a grand jury in the District of Columbia, there is nothing to indicate that the testimony he gave at that time was used before the Southern District grand jury in obtaining the indictment below. The conspiracy alleged here involved different persons and a time period different from that in *United States v. Lara;* none of the defendants named in *Lara* except Turner was named here as a defendant or a coconspirator. *Cf. United States v.*

*Papa,* 533 F.2d 815, 820 (2d Cir. 1976) (no double jeopardy in narcotics conspiracies when conspiracies involve different people and times); *United States v. McCall,* 489 F.2d 359, 362-63 (2d Cir. 1973), *cert. denied,* 419 U.S. 849, 95 S.Ct. 88, 42 L.Ed.2d 79 (1974) (different evidence, acts, coconspirators, and areas of operation). Appellant in short has made no showing that would justify the ordering of a hearing on his claim.

### B. Prosecutor's Conduct During Trial

■■■ Appellant Wesley makes two claims of prejudicial misconduct on the part of the prosecution that, it is argued, should have resulted in a duly requested mistrial. Prosecution witness March was asked on his second redirect examination whether he had entered "a witness protection program"; he apparently did not answer. In context, this question was proper. Defense counsel had sought to undercut March's credibility on the previous cross-examination by establishing that he was receiving $36 per day from the Government, that he was "free" and could "come and go as [he] please[d]," and that his bail had been set for a low $1,000. Defense counsel had also read from the transcript of a hearing at which a federal drug agent had testified about a conversation with March; it there came out that March had once been sitting with "several other witnesses . . . apparently under witness protection in other cases that he had gotten to know." Thus the door had been left at least ajar by the defense for the prosecutor's question. *See United States v. Finkelstein,* 526 F.2d 517, 527 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); *United States v. Tramunti, supra,* 513 F.2d at 1118; *United States v. Cirillo,* 468 F.2d 1233, 1240 (2d Cir. 1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973).

■■■ Wesley also argues that questions asked prosecution witness Ellis as to where Paul DiGregorio had gone, eliciting an answer that he had "gone to jail," involved serious misconduct. But the court instructed the jury just after the question had been asked that DiGregorio was not on trial and

to "forget the rest." Moreover, the Government's opening had referred, without objection, to Pugliese's and DiGregorio's going to jail, and the witness Pannirello had been permitted to testify that Pugliese went to jail. Given the fact that none of the appellants were alleged to have associated directly with DiGregorio, it is difficult to see how they could have been prejudiced significantly by mention of his having gone to jail.

## V. EVIDENTIARY ISSUES

### A. *Contentions Related to Pannirello's Testimony*

 Pannirello was permitted by the trial court to identify appellant Green in court, after a suppression hearing at which he testified that he had met Green between ten and twenty times at Green's apartment in 1971 and 1972 and that he had been shown a spread of photographs including Green's between the time of his grand jury testimony and trial testimony in the *Tramunti* case. An agent of the Drug Enforcement Agency testified at the hearing that he showed Pannirello photographs of Green in a spread of approximately five or six other "mug" shots, and that Pannirello identified Green's photograph, having previously given a description of Green. Under these circumstances we see no basis for saying that the spread shown by the agent to Pannirello was "impermissibly suggestive" within *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and no basis for concluding that the identification was not independently based upon Pannirello's ten to twenty meetings

with Green at the latter's apartment.[7] *See United States v. Counts*, 471 F.2d 422, 424–25 (2d Cir.), *cert. denied*, 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973); *United States ex rel. Phipps v. Follette*, 428 F.2d 912, 914–16 (2d Cir.) (upholding identification based on 20–30 second glance), *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

 With regard to another aspect of Pannirello's testimony, appellant Green sought a mistrial. The witness testified that he had heard on the radio "that there was a big bust" and that, as a result, he telephoned Green and told him they would "have to make other arrangements" because Pannirello was not "coming near the building [where Green's apartment was located] any more." The request for a mistrial was made on the basis that the jury could have inferred that Green had been arrested. At the time the "big bust" was mentioned, the court instructed the jury: "[F]orget about it. He heard something on the radio." Subsequently, upon denying the mistrial motion, the court gave an additional instruction: "When I suggest to you that a matter should be stricken from your mind, I want you to ignore it. Take out that little mental eraser and ignore it."

The statement by the witness here, uncalled for to be sure, was not so prejudicial in the overall context of the trial as to warrant a mistrial. The court's added remark, that "[w]hatever I am asking you to forget about has nothing whatsoever to do with these defendants on trial, nothing at all," can be treated as eliminating any seri-

7. Green also argues that Government counsel may have made some suggestion to Pannirello as to Green's identity sometime during the 12 to 24 hours prior to the in-court identification. On the day before Pannirello made the identification, he was quoted by Government counsel as having said at a lunch recess in the prosecutor's office that he had not seen Green in the courtroom, at a time when the latter was present. Green's intimation of Government impropriety is nothing more than that. He failed to question Pannirello at the suppression hearing as to whether there had been any impermissible suggestion by Government counsel, and the record discloses no evidence of such taint. There is, moreover, an innocent explanation for Pannirello's statement the previous day that he had not seen Green in the courtroom. Pannirello at that point had been on the witness stand for only a brief period of time (the transcript covers just 16 pages), and it is quite possible that, in the confusion of the crowded courtroom in those first few minutes, he did not see the appellant Green. He had not been asked to make any in-court identification prior to that lunch conversation with Government counsel; when he was asked to do so the next day, he presumably concentrated on that question and had no trouble identifying Green.

**1358**

ous possibility of prejudice, coming as it did immediately after the "bust" testimony and the side-bar conference. "A perfect trial," as Judge Soberoff once reminded us, "is as rare as the perfect crime." *Jones v. United States*, 262 F.2d 44, 48 (4th Cir. 1958), *cert. denied*, 359 U.S. 972, 79 S.Ct. 886, 3 L.Ed.2d 838 (1959).

■ Appellant Salley asserts error in the trial court's refusal to instruct the jury that it could not infer that the "Henry Salley" to whom Pannirello referred in his testimony was the defendant Henry Salley. Because Pannirello had not been able to identify Salley in the *Tramunti* trial, the court below prohibited him from identifying Salley in this trial. Pannirello was permitted to testify, however, about a meeting he and Provitera had at a New Jersey Howard Johnson's with Robinson and a man named "Salley." This testimony could stand on its own and be given whatever weight the jury felt it deserved. There was other testimony linking Salley to Robinson, including Provitera's, and a hotel registration card placed Salley with Robinson at the Howard Johnson's at the time as to which Pannirello was testifying. The jury was therefore entitled to infer that Pannirello's "Salley" was the appellant Henry Salley, despite the lack of in-court identification.

**B. *Seized Drugs and Paraphernalia***

■ Appellant Green argues that the admission of lactose seized from codefendant Walter John Smith's store, of 61 grams of heroin and 48 grams of cocaine purchased by an informant from Smith, and of heroin and narcotics paraphernalia seized from Basil Hansen's apartment following a lawful search was erroneous. But this evidence tended to show the states of mind of the defendants Smith and Hansen and the existence of the conspiracy, as well as to corroborate the testimony of accomplices, and for these purposes it was properly admitted. *See United States v. Bermudez*, 526 F.2d 89, 95–96 (2d Cir. 1975), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976); *United States v. Tramunti, supra*, 513 F.2d at 1116. Unwarranted prejudice to Green was made unlikely by an instruction to the jury that drugs seized from Hansen's apartment were to be considered only against him on the substantive count with which he was charged. *See United States v. Bermudez, supra*, 526 F.2d at 96 n.4. The lactose and narcotics related to Smith were most unlikely to prejudice Green, since Smith operated in Washington while Green operated in New York, with no suggestion of any connection between them other than the aforementioned Pugliese connection.

**C. *Questions to Dawson on an Ultimate Issue***

■ Appellant Wesley argues that questions permitted to be asked by the prosecution of the witness Dawson in effect invaded the province of the jury by seeking a conclusion or ultimate inference. While there is some doubt whether Wesley properly objected to these questions and whether the questions actually did relate to an ultimate issue, we need not reach either of these problems. Federal Rule of Evidence 704, ignored by both sides,[8] makes it absolutely clear that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces

---

**8.** It is perhaps significant that appellant Wesley, in arguing that admission of the questions was error, cites no cases more recent than 1952. The Advisory Committee's Note to Fed. R.Evid. 704 states that the "modern . . . trend [is] to abandon the [former] rule completely." Wesley also cites the 1954 edition of the McCormick treatise on evidence, but the current, 1972 edition discusses the modern trend and scathingly criticizes the rule Wesley seeks to have us follow:

> This change in judicial opinion has resulted from the fact that the rule excluding opinion on ultimate facts in issue is unduly restrictive, pregnant with close questions of application and the possibility of misapplication, and often unfairly obstructive to the presentation of a party's case, to say nothing concerning the illogic of the idea that theses opinions usurp the function of the jury.
> *McCormick's Handbook of the Law of Evidence* § 12, at 27–28 (2d ed. E. Cleary 1972).

an ultimate issue to be decided by the trier of fact."

## VI. FAIRNESS OF THE TRIAL

Appellants Ramsey, Taylor, Wesley and Turner all make nonevidentiary claims relating to the fundamental fairness of the trial. Ramsey and Taylor argue that a mistrial should have been granted after the jury saw four of the defendants in manacles on one or more occasions. Wesley argues that he was improperly denied his right to be present at the trial. Turner argues that he was denied effective assistance of counsel. And Ramsey and Taylor further argue that they were improperly required to rest without adequate opportunity to produce material witnesses.

### A. *Jury's View of Defendants in Manacles*

The Ramsey-Taylor argument may be stated simply: prejudice may arise from jurors seeing a defendant in manacles as he is being escorted through the courthouse and certainly arises when some of the defendants are seen in manacles and others are evidently free to come and go as they please, even though none of the defendants is manacled or in prison garb in the courtroom. *See generally United States v. Torres*, 519 F.2d 723, 727 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975); *Kennedy v. Cardwell*, 487 F.2d 101, 109 (6th Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). In *Torres* we held that the prejudice that might have been caused by a single chance encounter in which jurors saw defendants in handcuffs had been cured by the trial court's prompt holding of a voir dire examination of the jurors who saw the defendant and by its decision to excuse an alternate juror who said that the view might affect her judgment. Here the trial judge conducted no voir dire following the one alleged viewing of defendants in manacles brought to its attention; other similar viewings were asserted by the defendants.

None of the defendants allegedly seen in manacles, however—Ramsey, Taylor, Turner and Hansen—ever requested a voir dire, and we cannot reverse the trial court for failing to hold one sua sponte. There is considerable doubt, moreover, whether the appellants were actually seen by jurors when the door of an elevator carrying some jurors opened as the elevator stopped at the floor of the courthouse where the appellants were standing with deputy marshals. Without objection from the appellants, the marshals were each interrogated and said that the jurors likely did not see the appellants, and a United States Magistrate, who was riding on the same elevator as the jurors, said that he did not see appellants. The court then denied motions for a mistrial on the ground that the viewing was "not sufficient to prejudice the jury." Numerous cases support the proposition that an inadvertent view by jurors of defendants in handcuffs, without more, is not so inherently prejudicial as to require a mistrial. *See, e. g., United States v. Chipman*, 513 F.2d 1262, 1263 (6th Cir. 1975) (per curiam); *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974); *United States v. Hopkins*, 486 F.2d 360, 362–63 (9th Cir. 1973) (per curiam); *United States v. Hamilton*, 444 F.2d 81, 82 (5th Cir. 1971) (per curiam). Here Judge Duffy took steps to cure whatever prejudice might otherwise have resulted by granting appellants' requests for an instruction to the jury, the instruction quite appropriately pointing out that the reason for some defendants (not identified by the court) being in custody while others were not was that some defendants were able to afford bail and others were not and that the jury was to draw no inference from whether or not a defendant was able to afford bail. The inquiry made and the curative charge together served, we think, to supplant the voir dire of the allegedly exposed jurors. *See United States v. Acosta-Garcia*, 448 F.2d 395, 396 (9th Cir. 1971). Such a voir dire might only have exacerbated the situation by making the questioned jurors more

aware, or perhaps aware for the first time, that some defendants were in custody.

### B. *Wesley's Absence from Trial*

██ Appellant Wesley claims he was denied his constitutional right to be present at his trial, a right codified in Fed.R.Crim.P. 43. In March, 1976, during a weekend recess in the midst of the trial, Wesley was arrested by federal officials in Washington, D.C. Trial counsel related this to the court on Monday, March 8, pointing out that she could not waive his appearance but stating her belief that proceeding with the trial in his absence (but with his counsel present) would be "perfectly satisfactory" to Wesley. The court proceeded with the trial that day and the next without protest, while it made efforts to have Wesley released. He was still in jail on Wednesday, March 10, at which point his counsel commented that the situation was "serious." Wesley was finally released Wednesday night and appeared in court Thursday, having been absent for three days of trial without any fault on his part or the part of the prosecution in this case. The court attempted to cure any prejudice caused to him by his absence by advising him of the proceedings held in his absence, arranging for him to have a copy of the transcript of the proceedings, and offering to recall any witnesses who had testified during his absence. Wesley did not request the recall of any witnesses, even after the court, over a week after Wesley returned, reminded him that he could do so. The Government argues that he thereby waived his right to be present as to those days, *see United States v. Crutcher*, 405 F.2d 239, 243 (2d Cir. 1968), *cert. denied*, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969); *Parker v. United States*, 184 F.2d 488, 490 (4th Cir. 1950) (per curiam), but we need not decide that question. Almost none of the testimony heard during the three days dealt with Wesley. Moreover, he absented himself from the trial voluntarily on a number of occasions, so that the jury was unlikely to draw any adverse inference from his absence on the

three days in question. In view of these facts and the opportunity Wesley had to review the transcript and recall witnesses, any error resulting from his absence must be considered harmless.

### C. *Effectiveness of Counsel*

██ Appellant Turner claims a denial of "effective assistance of counsel," *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), based upon the alleged inadequacy of his appointed counsel's cross-examination of Dawson. After that cross-examination, Turner contacted private counsel to take over his defense, but counsel said she would do so only if Turner could obtain a severance and continuance, which motions were denied. Appellant was, however, at his request permitted to proceed pro se. It is the law of this circuit that assistance of counsel will not be deemed inadequate as a matter of constitutional law unless it "was such as to make the trial a farce and a mockery of justice . . . ." *United States v. Wight*, 176 F.2d 376, 379 (2d Cir. 1949), *cert. denied*, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950). Under this test, Turner's claim plainly must be denied.

Turner urges us, however, to reconsider *Wight* in light of the positions taken by several other circuits, which have rejected the "farce and mockery" test in favor of a standard of reasonable competency. *See* cases collected in *Rickenbacker v. Warden*, 550 F.2d 62, 65–66 (2d Cir. 1976). We need not reach this question, however, for here, as was held by the majority to be the case in *Rickenbacker, id.* at 66, the representation of Turner would be deemed adequate under any of the suggested standards. Two examples suffice to demonstrate this point. When Dawson had difficulty identifying Turner, the latter's counsel sought to discover whether the Government had coached Dawson by showing him photographs of Turner. At another point, Turner's counsel asked Dawson to draw a diagram of the apartment where, he testified, Turner had come to pick up narcotics sam-

ples. Dawson's omission of a crucial hallway from the floor plan provided all defense counsel with an opportunity to attack the witness's credibility. These examples and our study of the rest of Turner's counsel's cross-examination of Dawson convince us that it cannot be characterized as unreasonably incompetent.

### D. *Requiring Appellants to Rest Without Witnesses*

■ Appellants Ramsey and Taylor each claim that they were improperly required to rest before having an opportunity to produce material witnesses. In the case of Ramsey, who is represented on this appeal by counsel but who has also submitted a "supplemental brief" pro se together with an application for leave to proceed in forma pauperis (which, for the sake of consideration of his brief, we hereby grant), the witness was one Christine Green, a cousin of Government witness Ellis. The court informed the defendants on Friday, March 19, 1976, that if none of their witnesses appeared the following Monday they would be required to rest. The prosecutor at that time told the court that the appellant had asked for help in locating Christine Green the previous day. The prosecutor asserted that he did not know where she was and that the telephone of her cousin had been delisted, so that he could not contact her. On Monday morning the prosecutor advised the court that he had been able to get Miss Green's telephone number and had spoken with her mother, that he had told the mother that he was not subpoenaing Christine Green but would like her to appear at 9:45 a. m. at his office. She did not do so. Counsel for Ramsey conceded knowing of the existence of a woman named Christine for approximately three weeks before inquiring about her last name or whereabouts. We see no good reason for defense counsel's delay in failing to seek to obtain the necessary information and to request a subpoena by affidavit to the court under

Fed.R.Crim.P. 17(b). *See United States v. Jones*, 487 F.2d 676, 679 (9th Cir. 1973). Having failed to move timely, appellant may not now complain about the absence of the witness. *See Ray v. United States*, 367 F.2d 258, 264–67 (8th Cir. 1966), *cert. denied*, 386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785 (1967).[9]

Even considering the question as if a timely request had been made, however, there is no indication either in the brief by counsel or in the record that Miss Green's testimony would have been beneficial to appellant. Evidently she was present on a trip that Ellis took with Ramsey to New York from Washington. All that we have before us is the pro se claim that she would have testified that appellant did not in fact participate in any conspiratorial acts or conversations during the trip.

Appellant Taylor's claim is somewhat more complex. He argues that he asked the Government on or about February 3, 1976, early in the trial, for production of one Cornelius Garner, also known as "Moochie," who was at the Metropolitan Correction Center in New York at that time. The exchange of counsel in court made it clear that Garner would be produced only upon timely notice from defense counsel, and the Government advised the court of its position that "we cannot keep everybody over at MCC." Some five weeks later, on March 10, 1976, Taylor's counsel stated that he wanted to speak to Garner, who had been moved to a federal prison in Virginia. On March 12 a writ of habeas corpus ad testificandum was issued to have Garner produced. On March 17, the Government informed the court that the United States Marshal was arranging for Garner to be flown to New York, but two days later he had not yet arrived. On Monday, March 22, he still had not arrived; the court at that point observed that the Government had cooperated "to the best of their ability," echoing the March 19 statement of Taylor's

---

9. There is no question here of willful suppression of evidence favorable to the defendant in violation of the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

counsel that the Government had been "more than cooperative" in helping the defense to obtain witnesses. The court then held, over Taylor's objection and motion for a continuance, that the defense would be deemed to have rested.

 While ordinarily it would be of the greatest moment if a defendant were denied his right to compel the attendance of witnesses in his defense, *see Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Washington v. Texas,* 388 U.S. 14, 18–19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), particularly when the defendant seeks a witness in Government custody, here there was no showing either at the time of the request or subsequently as to what favorable evidence Garner would have provided if he had been called to testify and had waived his Fifth Amendment privilege. It is not improper to deny a request for a subpoena where the testimony of the witness would be only cumulative, *United States v. Rosa,* 493 F.2d 1191, 1194 (2d Cir.), *cert. denied,* 419 U.S. 850, 95 S.Ct. 89, 42 L.Ed.2d 80 (1974), where the defendant is vague as to the witness's potential evidence and is also aware that the witness might invoke the Fifth Amendment, *United States v. Wyler,* 487 F.2d 170, 173–74 (2d Cir. 1973), or where the witness would only give irrelevant testimony not necessary to an adequate defense, *United States v. Romano,* 482 F.2d 1183, 1195 (5th Cir. 1973), *cert. denied,* 414 U.S. 1129, 94 S.Ct. 866, 38 L.Ed.2d 753 (1974). *See also United States v. Sellers,* 520 F.2d 1281, 1285–86 (4th Cir. 1975), *vacated on other grounds,* 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 728 (1976). *Cf.* Fed.R.Evid. 403 (relevant evidence may be excluded because of "considerations of undue delay, waste of time, or needless presentation of cumulative evidence"). Since there was never any showing of what Garner's testimony would be, it was proper to deny the continuance.

## VII. OTHER INDIVIDUAL POINTS

Three of the appellants raise points that do not fit under any of the headings above.

Taylor claims he should have been granted a severance, a transfer, and a continuance. Green asserts error in the court's charge, and Salley raises a claim concerning his sentence.

### A. *Taylor*

 1. *Severance.* Taylor argues that he should have been granted a severance to enable him to obtain exculpatory testimony from codefendant Robinson. The argument is that Robinson's statement, after his own severance, that he had exculpatory testimony to offer on behalf of Taylor and three others that could not be offered because his testimony would be self-incriminating in his subsequent trial was enough to require severance under *United States v. Finkelstein, supra,* 526 F.2d at 523–24. There, in upholding denial of a similar severance motion, we indicated that the relevant considerations were "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege, . . . (2) the degree to which the exculpatory testimony would be cumulative," (3) the extent to which "judicial economy" would be served, and "(4) the likelihood that the exculpatory testimony would be subject to substantial, damaging impeachment . . . ." *Id.* We also noted that the decision to deny a severance may be reviewed only for abuse of discretion. *Id.* at 523, 525.

We cannot say that Judge Duffy here abused his discretion. First, Taylor's severance motion was somewhat untimely. He did not move for a severance until after the opening statements and at that time made only an informal, inadequate showing that Robinson's testimony would be forthcoming and exculpatory. It was only after the trial had run some six and one-half weeks that Taylor made a more formal showing regarding Robinson's testimony. Even this showing, however, failed to establish, as *Finkelstein* requires, that Robinson would waive his Fifth Amendment privilege; Robinson repeatedly asserted that he would not answer any questions until instructed by the court that he had no Fifth Amendment right to refuse to answer, and he declined

an offer to permit him to testify at trial with limited use immunity. Moreover, Robinson's conviction in *United States v. Tramunti* and his then-anticipated conviction for the conspiracy charged in this indictment would have subjected his testimony to significant impeachment, especially since his testimony would have flatly contradicted substantial other evidence of Taylor's involvement in the conspiracy. Finally, with six and one-half weeks of a nine-week trial completed, considerations of judicial economy also weighed in favor of denial of the severance.

■ 2. *Transfer.* Taylor also argues that the trial court should have granted his motion for a transfer to the United States District Court for the District of Columbia under Fed.R.Crim.P. 21(b), which provides that the trial court "may transfer" a case to another district "[f]or the convenience of parties and witnesses, and in the interest of justice." [10] He claims that denial of this motion had several adverse effects: his right to call favorable witnesses under the Sixth Amendment was impaired; his Washington lawyer was unable to handle the case in New York; and the particular jury selected was totally unfamiliar with the city (Washington) in which all of the events relating to Taylor took place. As the use of the word "may" in the rule implies, however, this decision is discretionary with the trial court. *See United States v. Projansky,* 465 F.2d 123, 139 (2d Cir.), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); *United States v. Phillips,* 433 F.2d 1364, 1368 (8th Cir. 1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 900, 27 L.Ed.2d 819 (1971); *Jones v. Gasch,* 131 U.S.App.D.C. 254, 404 F.2d 1231, 1241–43 (1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968); 1 C. Wright, *Federal Practice and Procedure* § 344, at 636–37 (1969). Here Taylor's motion to transfer

was not made until the trial was two weeks old and the trial court reasonably denied the motion as untimely. A greater showing of inconvenience is obviously required when a transfer is sought late in the proceedings. *See United States v. Polizzi,* 500 F.2d 856, 899–901 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). Moreover, with regard to calling witnesses, Taylor had access to nationwide process. There is not even a claim that his New York counsel was incompetent. And to the extent that the geography of Washington was relevant, counsel could have offered a map or other evidence on the issue. We find no abuse of discretion.

■ 3. *Continuance.* This claim relates to the fact that Taylor first met his trial counsel on Saturday, January 24, 1976, with his trial scheduled to begin the following Monday, January 26. Counsel requested a one-week continuance, but the court granted only a two-day continuance. Appellant claims prejudice from the denial of the additional five days on the basis that the credibility of Government witness March—who claimed he witnessed a heroin delivery to Taylor at the latter's top floor apartment, while Taylor actually lived in a basement apartment—could have been shaken if counsel had had time to investigate in Washington. The granting or denial of a continuance lies within the sound discretion of the trial court. *United States v. Rosenthal,* 470 F.2d 837, 844 (2d Cir. 1972), *cert. denied,* 412 U.S. 909, 93 S.Ct. 2298, 36 L.Ed.2d 975 (1973). *See also United States ex rel. Martinez v. Mancusi,* 455 F.2d 705 (2d Cir.), *cert. denied,* 409 U.S. 959, 93 S.Ct. 273, 34 L.Ed.2d 228 (1972). The record discloses that counsel was assigned on Tuesday, January 20. Prosecutorial material required to be disclosed to defendant under 18 U.S.C. § 3500 was made available to counsel on Friday, January 23. Jury

10. Appellant Taylor cannot make the related argument that venue was improper since venue for charges of conspiracy may lie under 18 U.S.C. § 3237(a) either where the agreement was made or where any overt act in further-

ance of the conspiracy occurred. *See United States v. Sanchez,* 508 F.2d 388, 394 (5th Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 45, 46 L.Ed.2d 44 (1975).

selection began on January 29 and continued through February 4, on which date opening statements were heard and direct examination of the Goverment's first witness began. Thus Taylor's counsel had nine days to prepare for trial prior to the commencement of jury selection and almost another week before any testimony was taken. Moreover, part of the blame for any lack of preparation on the part of his counsel must rest with Taylor. He was arraigned nearly six months prior to the commencement of trial, at which time a lawyer was appointed for him whom he later dropped. In view of this fact, the time his second counsel did have to prepare, and the comparatively minor nature of the prejudice asserted, we cannot say that the denial of a five-day continuance was an abuse of discretion.

### B. *Green*

▆▆▆ Only appellant Green complains about the court's charge (except the charge on multiple conspiracies, which we have discussed *supra*). He argues that the court granted his motion as to requested jury instructions,[11] the court saying it would give the charge "in my language," but that the court then failed to give the instructions. We read Judge Duffy's charge, however, as including all of the elements requested by Green in substance: concededly he charged as to the dangers of accomplice testimony; he also charged that the Government to prevail had to prove the essential elements of each count beyond a reasonable doubt and that the jury had to consider each count separately and render a separate verdict as to each count and each defendant, reminding the jury that it was for them to determine the facts and weigh

the evidence according to their recollection of the evidence. The law is clear that, if the substance of a defendant's request is given by the court in its own language, the defendant has no cause to complain. *See, e. g., Sugarman v. United States,* 249 U.S. 182, 185, 39 S.Ct. 191, 63 L.Ed. 550 (1919) (Brandeis, *J.*); *United States v. Kelly,* 349 F.2d 720, 760–61 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). The only part of Green's requested charge that the court did not in substance deliver was that referring specifically to Pannirello and Provitera as the witnesses who had inculpated Green. If Green's argument here is that the court's failure to marshal the evidence was error, which is the same complaint that appellant Wesley makes for the first time on appeal, it must be rejected. The trial court has substantial discretion to decide whether to comment upon or summarize the evidence. *See United States v. Natale,* 526 F.2d 1160, 1167 (2d Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976); *United States v. Tourine,* 428 F.2d 865, 869–70 (2d Cir. 1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971).

### C. *Salley*

▆▆ Appellant Salley's claim regarding his sentence stems from the fact that his previous conviction in the *Tramunti* case was reversed on appeal, with this court granting his request for a new trial. *See* 513 F.2d at 1116–17. That new trial led to the conspiracy conviction being reviewed on this appeal. In *Tramunti,* Salley was given a five-year prison sentence plus three years' special parole; Judge Duffy imposed the same sentence (with credit for time previously served) following Salley's conviction

---

11. The charge requested by Green and agreed to by Judge Duffy in substance was as follows:

That both Harry Panirello [*sic*] and James Provitera are considered to be accomplices in the alleged conspiracy. That I charge you that you must carefully scrutinize accomplice testimony and consider it with caution.

If after careful consideration you find the defendant, AL GREEN, was not proven guilty

beyond a reasonable doubt by the Government through the testimony of either or both Harry Panirello [*sic*] and James (Jimmy) Provitera, after applying the rules of the presumption of innocence as presented to you by the Court, I charge you that you must acquit the defendant, AL GREEN, on all counts of the indictment.

in the instant case, *see* note 1 *supra.* Salley now argues that his sentence here was "in effect" a more severe sentence than the one previously imposed, in violation of the rule of *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), because "[i]t is possible that the defendant may not receive the same consideration for parole he would have received had he remained in confinement under the [*Tramunti*] conviction," rather than appealing and obtaining a reversal. This claim is obviously wholly speculative, and even as a prediction its force is vitiated by Judge Duffy's on-the-record concern that Salley be considered for parole "at the earliest time." If it later turns out that there is some different standard for parole prevailing by virtue of Salley's appeal and new sentence, Salley will be able to seek relief at that time under 28 U.S.C. § 2255.

## VIII. COURT'S COMMUNICATION WITH A JUROR

■ A substantial claim raised by all appellants relates to the trial court's private communications with one juror during the jury's deliberations. Communications with the jury may violate the defendants' right to be present at all stages of the proceedings. *See* Fed.R.Crim.P. 43(a); *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (reversible error to advise jury in response to jury request, without notifying defense counsel, that court would accept verdict of guilty "with extreme mercy of the Court"); *United States v. Glick,* 463 F.2d 491, 493 (2d Cir. 1972) (terming right an "unequivocal mandate"). Because an important right is involved, one with constitutional underpinnings, *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), private communications

with the jury have been said to "create a presumption of prejudice." *United States v. Treatman,* 524 F.2d 320, 323 (8th Cir. 1975); *see United States v. Pfingst,* 477 F.2d 177, 198 (2d Cir. 1973) (Government has burden of persuasion as to harmlessness to defendant of communication), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973). This presumption may be overcome, however, by evidence showing lack of prejudice. *United States v. Treatman, supra,* 524 F.2d at 323; *see Rogers v. United States, supra,* 422 U.S. at 40, 95 S.Ct. 2091 (harmless error rule applies to private court-jury communications); *United States v. Glick, supra,* 463 F.2d at 493; *United States v. Schor,* 418 F.2d 26, 30 (2d Cir. 1969). The question could also be waived, as by the court's procuring advance consent of counsel on both sides and of the defendants themselves.

In the present posture of this case, we find it somewhat difficult to determine whether Judge Duffy's private communications with a juror [12] prejudiced the appellants in any way. No record whatsoever was made of the communications at the time. Some twelve hours later, the judge in camera, without the presence of any counsel or of the juror, dictated his recollection of the discussion he had had with the juror; this transcript was ordered sealed by the court. Seven months later, upon a request by this court to the district court clerk's office for the sealed transcript, it was discovered that the document had been lost (apparently either in that office or the judge's chambers), that there were no copies, and that the stenographer's notes had been destroyed. Judge Duffy then sua sponte dictated and furnished to us under seal what he considered to be "the most accurate re-creation of the record possible."

---

12. Appellant Ramsey mentions in his brief that the trial court also communicated privately with one other juror. This latter communication, however, was promptly revealed to defense counsel and was of such an innocuous nature—involving the time at which Sabbath candles had to be lit that particular Friday and a promise by the court to try to get the juror home in time (the jury was not being sequestered)—that no appellant (including Ramsey) claims it was prejudicial.

We have noted the substance of the communication as reported in this second sealed transcript in the margin.[13]

■ There having been no informed consent to the communications, it was error for the court not to reveal the substance of these communications to counsel for both sides. Before deciding to deny the juror's request to be excused from the trial, the court should have had "an informed discussion [with counsel] on the proper course to follow." *United States v. Van Meerbeke*, 548 F.2d 415, 418, (2d Cir. 1976). The fact that the court might then have similarly denied the request, we recently stated in a related context, "is irrelevant to the right of the appellant[s] to be informed . . . and also ignores the benefits which informed discussion and debate between court and counsel may produce even where a court may be aware in the abstract of its own alternatives." *United States v. Robinson*, 544 F.2d 611, 621 (2d Cir. 1976), *rehearing en banc granted*, No. 76–1153 (Feb. 17, 1977). It also makes no difference that the matter was personal, unrelated to the trial as such, and possibly embarrassing to the juror in its details. These factors would justify informing counsel at a side bar or in chambers, rather than in open court, but they cannot outweigh a defendant's right to be "present" for all aspects of his trial. A slight degree of potential embarrassment faced by a juror is of little moment when compared to the potential loss of liberty faced by a defendant.

While we therefore have concluded that the trial court committed error, we also believe that the error was harmless under the circumstances. We note that the deliberations here continued for almost two days of the four and one-half day total *after* the juror spoke to the judge. During these days, moreover, there is no indication that the juror in any way renewed his request or spoke to the judge again about his problem, which suggests that he was not particularly concerned about it. While one might learn more about these factual questions by holding a hearing at which the juror could be interrogated, *see United States v. Remmer*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States v. Dellinger*, 472 F.2d 340, 377–80 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), we are not convinced that a hearing would assist us in resolving the ultimate question of prejudice at this late date. *See United States v. Dozier*, 522 F.2d 224, 228 (2d Cir.), *cert. denied*, 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394 (1975). The time for these potential difficulties to be aired with counsel is the time at which the juror's problem comes to the court's attention. It is regrettable that the court did not do so in this case; we trust it will not happen again.

There are a few other points made by appellants in this rather lengthy appeal. We have considered them all and found them without merit. In a trial that was by no means perfect, but which contained no error sufficiently heinous as to create any real prejudice to any appellant, we affirm the convictions, satisfied that there was more than sufficient evidence to support the jury verdict.

Affirmed.

TIMBERS, Circuit Judge, concurring specially:

I concur in the judgment of the Court which affirms the convictions of all appellants on all counts.

I also concur in most of Judge Oakes' thoughtful, perceptive majority opinion. With respect to the issues referred to below, however, while I concur in the result reached and the actual holding on each issue, I wish to state separately the grounds of my concurrence.

(1) *Effective Assistance Of Counsel*

Appellant Turner claims a denial of effective assistance of counsel based upon the

---

**13.** Judge Duffy's transcript dated October 28, 1976, reveals that a particular juror came to him with a "personal problem" involving a death in the family and a request to withdraw to make appropriate arrangements. Judge Duffy interrogated the juror and ascertained that "he was willing to continue to serve as a juror" and "[u]nder all the circumstances [he] denied the request." Nothing in the sealed transcript indicates that the juror felt any further compunction in continuing to perform his duties as a juror or any time pressure to cut short deliberations.

alleged inadequacy of his appointed counsel's cross-examination of Dawson.

Under the standard in this Circuit for determining lack of effective assistance of counsel as enunciated in *United States v. Wight,* 176 F.2d 376, 379 (2 Cir. 1949) (Smith, *J.*), *cert. denied,* 338 U.S. 950 (1950), and as recently reaffirmed in *Rickenbacker v. Warden,* 550 F.2d 62, 65–66 (2 Cir. 1976) (Smith, *J.*), Turner's representation was not ineffective and his claim must be denied.

The majority opinion, after citing *United States v. Wight, supra,* holds that "[u]nder this test, Turner's claim plainly must be denied." Ante 1360. I agree.

Judge Oakes, who was the author of the *dissenting* opinion in *Rickenbacker v. Warden, supra,* then proceeds to discuss whether Turner's representation complied with the "standard of reasonable competency", ante 1360, and concludes that "it cannot be characterized as unreasonably incompetent", ante 1360—which is the standard advocated by Judge Oakes in his *dissenting* opinion in *Rickenbacker*: ". . . I think our court should recognize that the right is equally meaningless if counsel is not at least reasonably competent." 550 F.2d at 68.

Whether the purpose of this dictum in Judge Oakes' opinion is to have our Court appear to sidle into a double standard for determining effective assistance of counsel or simply to get around the *Wight-Rickenbacker* standard without bothering with the en banc procedure, I wish to make it clear that my concurrence in the holding on this issue is grounded solely on the standard in this Circuit for determining effective assistance of counsel as enunciated in *United States v. Wight, supra,* and the many, many cases in our Circuit which uniformly have

adhered to the stringent standard of *Wight* over a period of three decades.[1]

**(2)** *Court's Communication With A Juror Regarding A Deeply Personal Problem Of The Juror*

During the jury deliberations one juror came to Judge Duffy with a personal problem arising from a death in his family and particularly his obligations as a member of the Jewish faith to make funeral arrangements. Judge Duffy resolved the problem with the juror in such a manner as not to interrupt the jury deliberations and so as not to have the juror feel under any time pressure to curtail the deliberations.

The majority, while recognizing that the subject matter of the communication between the court and the juror had nothing to do with the merits of the case, was of deep personal concern to the juror and was somewhat embarrassing to the juror in its details, nevertheless concludes that the trial court committed harmless error. Ante 1366.[2]

I find no error whatsoever to have been committed by the trial court. On that ground I concur in the holding on this issue: that there is no basis for reversal or remand.

Moreover, experience on the trial court impels me to commend Judge Duffy for the manner in which he handled this *personal* problem of a juror without disrupting the jury deliberations and without placing the juror under any pressure.

**(3)** *"Wheel" And "Chain" Type Conspiracies*

Finally, after noting the government's description of the core group of the alleged conspiracy in the instant case "as the 'hub'

---

**1.** Since the filing of the opinion in the instant case, our Court in at least two other cases has adhered to the *Wight-Rickenbacker* standard. *LiPuma v. Commissioner, Department of Corrections,* 560 F.2d 84, 91 (2 Cir. 1977); *United States v. Bubar* (2 Cir. 1977), slip op. 4519, 4536 (June 30, 1977).

**2.** The majority's reliance, ante 1365, on *United States v. Robinson,* 544 F.2d 611, 621 (2 Cir. 1976), I assume to be inadvertent, the case

recently having been en banced and its continued viability being very much in doubt.

Since the filing of the opinion in the instant case, the en banc opinion in *United States v. Robinson,* 560 F.2d 507 (2 Cir. 1977) (en banc), expressly vacated the panel judgment and decision, *id.* at 509, and held that the trial court's failure to disclose the contents of the juror's note to counsel did *not* constitute prejudicial error. *Id.* at 516–17.

around which multi-kilogram quantities of narcotics were purchased and distributed", ante 1350, the majority proceeds in footnote 2 to note with approval "the Fifth Circuit's view" in belittling the distinction between "wheel" and "chain" type conspiracies. I decline to accept this view of the Fifth Circuit, if indeed it is that Circuit's view.

In the first place, the Fifth Circuit itself does not reject the distinction in *United States v. Perez,* 489 F.2d 51, 58–59 (text) and 59 n. 11 (first paragraph, immediately preceding the paragraph quoted by the majority in footnote 2) (5 Cir. 1973), *cert. denied,* 417 U.S. 945 (1974). In *United States v. Borelli,* 336 F.2d 376, 383–84 (2 Cir. 1964), *cert. denied,* 379 U.S. 960 (1965), I read Judge Friendly's opinion as stressing the importance of *accurately* describing the two types of conspiracies. And of course the distinction has become so entrenched in the minds of the bench and bar as the result of our many, many opinions using this terminology, see, e. g., *United States v. Sperling,* 506 F.2d 1323, 1330 (2 Cir. 1974), *cert. denied,* 420 U.S. 962 (1975); *United States v. Sisca,* 503 F.2d 1337, 1340, 1345 (2 Cir.), *cert. denied,* 419 U.S. 1008 (1974), that, until someone can devise better language, I think that a footnote of this sort serves only to add more confusion, especially since it is wholly unnecessary to the decision.